The Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| AMERICAN MANAGEMENT SERVICES EAST, LLC, a Washington limited liability company, AMERICAN MANAGEMENT SERVICES LLC, A Washington limited liability company, AMERICAN MANAGEMENT SERVICES CALIFORNIA INC., a Washington corporation, formerly d/b/a GOODMAN FINANCIAL SERVICES, INC., STANLEY HARRELSON, an individual, JOHN GOODMAN, an individual, PINNACLE IRWIN LLC, a Washington limited liability company, and PINNACLE MONTEREY LLC, a Washington limited liability company,<br><br>     Plaintiffs,<br><br>  vs.<br><br>SCOTTSDALE INSURANCE CO., a Delaware corporation, and LEXINGTON INSURANCE COMPANY, a Delaware corporation,<br><br>     Defendants. | CASE NO. 2:15-cv-01004-TSZ<br><br>PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO DEFENDANTS' DUTY TO DEFEND<br><br>ORAL ARGUMENT REQUESTED<br><br>NOTE ON MOTION CALENDAR: DECEMBER 18, 2015 |

PLAINTIFFS' MOTION FOR PARTIAL  SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND
Case Number:  2:15-CV-1004-TSZ

BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204
Telephone 503-228-2525

1035986\v3

# **Table of Contents**

**Page**

I. INTRODUCTION AND SUMMARY OF ARGUMENT ...............................................1

II. SUMMARY OF FACTS..............................................................................................2

   (A)  The Insurance Policies........................................................................... 2

   (B)  The Underlying Lawsuits and Allegations of Accidental Bodily
        Injury and Property Damage ................................................................. 3

   (C)  Other Lawsuits in California Filed by Military Families Illustrate
        the Insurers' Awareness of the Alleged Property Damage and
        Bodily Injury at Issue in the Underlying Lawsuits.............................. 8

   (D)  Plaintiffs' Tenders to Scottsdale and Lexington and the Insurers'
        Denial of Coverage ............................................................................... 9

III. ARGUMENT............................................................................................................10

   (A)  Under Washington Law, an Insurer Must Defend Where there is
        Any Conceivable Possibility that the Underlying Lawsuit Alleges
        Facts that Could Subject the Insured to Covered Liability ............... 10

   (B)  The Underlying Lawsuits Include Factual Allegations That Could
        Subject The Insureds To Liability Covered by the Scottsdale and
        Lexington Policies, Triggering the Duty to Defend .......................... 12

        1.  Factual Allegations in the Underlying Complaints Could Result
            in Liability Arising From "Bodily Injury" or "Property
            Damage"........................................................................................... 12

        2.  Factual Allegations in the Underlying Complaints Could Result
            in Liability Arising From an Accidental "Occurrence" ................... 13

   (C)  Extrinsic Evidence Demonstrates the Possibility that the Insureds
        Could Be Liable for Covered Damages Arising From the
        Underlying Lawsuits, Triggering the Duty to Defend ...................... 17

IV. CONCLUSION..........................................................................................................22

TABLE OF CONTENTS - I
Case Number:  2:15-CV-1004-TSZ

BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204
Telephone 503-228-2525

1035986\v3

1

## **Table of Authorities**

**Page**

2

3        **Cases**

4   *Paul v. Destito*, 250 Ga.App.631, 550 S.E.2d 739 (2001)............................................ 16

5   *Aetna Cas. & Sur. Co. v. Dichtl,*
        78 Ill.App.3d 970, 34 Ill.Dec. 759, 398 N.E.2d 582 (1979) ............................15

6   *Am. Best Food, Inc. v. Alea London, Ltd.,*
        168 Wash.2d 398 (2010)............................................................. 10, 11, 13, 16

7

8   *Boeing Co. v. Aetna Cas. & Sur. Co.,*
        113 Wash.2d 869 (1990).......................................................................... 10

9   *Cle Elum Bowl, Inc. v. North Pacific Ins. Co.,*
        96 Wash.App. 698 (1999)......................................................................... 14

10

11  *Douglas v. Bigley,*
        278 Ga.App 117, 628 S.E.2d 199 (2006)....................................................... 16

12  *Expedia, Inc. v. Steadfast Ins. Co.,*
        180 Wash.2d  793 (2014)............................................................ 10, 13, 17, 18

13  *Nationwide Mut. Ins. Co. v. Hayles, Inc.,*
        136 Wash.App. 531 (2007)....................................................................... 15

14

15  *Overton v. Consolidated Ins. Co.,*
        145 Wash.2d 417 (2002)......................................................................... 14

16  *Queen City Farms, Inc. v. Central Nat'l Ins. Co. of Omaha,*
        126 Wash.2d 50, 69 (1994)................................................................. 14, 15

17

18  *U.S. Fidelity & Guar. Co. v. Korman Corp.,*
        693 F.Supp. 253 (E.D. Pa. 1988) ............................................................... 13

19  *Unified Western Grocers, Inc. v. Twin City Fire Ins. Co.,*
        457 F.3d 1106 (9th Cir. 2006) ................................................................. 16

20  *Woo v. Fireman's Fund Ins. Co.,*
        161 Wash.2d 43, 64 (2007)................................................................ 11, 13, 17, 21

21

        **Rules and Regulations**

22  Fed. R. Civ. P. 56 ................................................................................. 1

23

24

25

TABLE OF AUTHORITIES - I
Case Number:  2:15-CV-1004-TSZ

BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204
Telephone 503-228-2525

1035986\v3

Pursuant to Fed. R. Civ. P. 56, plaintiffs respectfully ask this Court to enter a summary judgment order finding that defendants breached their duty to defend plaintiffs in two underlying lawsuits. The relevant facts are undisputed, and plaintiffs are entitled to judgment as a matter of law as to defendants' duty to defend.

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

This is an insurance coverage lawsuit arising from defendants' wrongful denial of plaintiffs' claims for defense and indemnity of two underlying lawsuits. The present motion is directed solely at whether defendants had a duty to defend plaintiffs in those lawsuits.[1]

Insurance contracts are unique in their purpose. They are meant to provide the security and peace of mind through protection against catastrophe. The insurer's duty to defend is one of the principal benefits of a liability policy. It is meant to guarantee that an insured will have a vigorous defense provided and paid for by the insurer – and will not be abandoned and left to shoulder that burden on its own. To guarantee that the insured receives the security and peace of mind promised by the insurance contract, Washington courts apply exceptionally broad standards on the duty to defend.

Washington law applies a conceivability test to the duty to defend. Under that test, an insurer must determine whether the complaint, insurance policies, and the law (all of which must be liberally construed in favor of the insured) give rise to any set of facts that could conceivably result in covered liability.  After applying that test, if there is any possibility of coverage or any ambiguity regarding the insurers' obligations (whether in the facts, policies, or law), the insurer

---

[1] This motion solely references the Fifth Amended Complaints that were filed in the Georgia and California Lawsuits. ECF 51-5, 51-11. This motion addresses only whether the Insurers had a duty to defend the AMS Insureds in the Underlying Lawsuits, not when that duty was triggered.  To the extent necessary, that issue (that is, when the duty was triggered) will be addressed in subsequent motions.

For the Court's reference, the AMS Insureds have attached an Appendix summarizing the relevant allegations from the Underlying Lawsuits and extrinsic evidence relied upon in support of their request for coverage. *See* Declaration of Kyle A. Sturm in Support of Plaintiffs' Motion for Partial Summary Judgment as to Defendants' Duty to Defend ("Sturm Dec."), Ex. 1.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 1
Case Number:  2:15-CV-1004-TSZ

BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204
Telephone 503-228-2525

1035986\v3

is required to defend. The Washington Supreme Court has provided insurers with clear instruction on what to do if the facts or the law impacting coverage are disputed: they must defend under a reservation of rights until coverage questions can be resolved in a declaratory action. In the face of *any* question of fact or law, however, insurers cannot simply refuse to defend.

The insurers here, Scottsdale and Lexington, violated these basic tenets of Washington law. They failed to give their insureds the benefit of the doubt on *every* allegation, fact and issue of law and instead affirmatively elected to give themselves the benefit of the doubt at every opportunity. Scottsdale and Lexington ignored any possibility that the underlying lawsuits conceivably alleged unintended bodily injury and property damage—which they did. The insurers were required to defend under a reservation of rights and file a declaratory relief action—which they did not do.

Summary judgment should be granted here for two principal reasons: (1) the underlying complaints, broadly construed in favor of the insureds, allege unintended "property damage" and "bodily injury," and (2) extrinsic evidence readily available—and specifically provided—to Scottsdale and Lexington illustrates that plaintiffs in the underlying lawsuits heavily litigated claims that the insureds caused serious and repeated bodily injury and property damage. Rather than defend their insureds—as they were required to do—the insurers refused to defend based on the narrowest, self-serving interpretations of the facts, policies, and law.

## II. SUMMARY OF FACTS

**(A)     The Insurance Policies**

Defendants Lexington Insurance Company ("Lexington") and Scottsdale Insurance Company ("Scottsdale") (collectively, "the Insurers") issued a series of general liability policies

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 2
Case Number:  2:15-CV-1004-TSZ

BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204
Telephone 503-228-2525

1035986\v3

between 2003 and 2012 (collectively, the "Policies")[2] that provided coverage for plaintiffs (collectively "the AMS Insureds[3]"). The Policies provide that the Insurers will defend an "insured" in any lawsuit seeking damages for "property damage" or "bodily injury" caused by an "occurrence."  The term "bodily injury" is defined to include "bodily injury, sickness, or disease sustained by a person."  "Property damage" means either "[p]hysical injury to tangible property, including all resulting loss" or "[l]oss of use of tangible property that is not physically injured." An "occurrence" is defined as an "accident, including continuous or repeated exposure to the same general harmful conditions."[4]

**(B)     The Underlying Lawsuits and Allegations of Accidental Bodily Injury and Property Damage**

The AMS Insureds were named as defendants in underlying lawsuits in Georgia[5] and California.[6] The only expressed motivation for filing the Underlying Lawsuits was to "address concerns for resident safety."[7]

The Underlying Lawsuits alleged (among other things) that the AMS Insureds engaged in a pattern of misconduct, including manipulating the response and closing times for maintenance work orders, prematurely closing maintenance work orders, inadequately repairing or completely failing to repair damage to the facilities, retaining unqualified vendors, and converting property

---

[2] Lexington issued general liability insurance policies, numbered 3470023, 0328814, 2606695, 6120162, 0631748, that were effective from Apr. 10, 2003, to Apr. 10, 2008. *See* ECF 50-1 to 50-5.  Scottsdale issued four general liability policies, and an excess insurance policy, numbered RBS0001646, RBS0001718, RBS0002725, RBS0002791 and XLS0050472, which were effective from Apr. 10, 2008, to Apr. 10, 2012. *See* ECF 50-6 to 50-10.

[3] The relationship between the various AMS Insureds is explained in the Declaration of Andrew Matthews in Support of Plaintiffs' Motion for Partial Summary Judgment as to Defendants' Duty to Defend ("Mathews Dec."), ¶¶ 3-13.

[4] *See* ECF 50-1, pp. 27, 29-30 for definitions of "property damage," "bodily injury," and "occurrence" in Lexington Policies.  *See* ECF 50-6, pp. 33-35 for the same definitions in the Scottsdale Policies.  The definitions of the terms are substantially uniform throughout the series of policies issued by each insurer. *See* ECF 50-1 to 50-10.

[5] *Fort Benning Family Communities LLC, et al. v. Am. Mgmt. Servs. E. LLC, et al.*, Superior Court of Muscogee County (Georgia), Case No. SU10CV2025-F ("the Georgia Lawsuit"). ECF 51 to 51-5.

[6] *Monterey Bay Military Housing LLC, et al. v. Pinnacle Monterey LLC, et al*, U.S. Dist. Court, N.D. Cal., Case No. 14-CV-3953 BLF, which was originally filed in the Superior Court of Monterey County (California), Case No. M112710 (M115143) ("the California Lawsuit"). ECF 51-6 to 51-11.  The Georgia and California Lawsuits are collectively referred to as the "Underlying Lawsuits."

[7] Sturm Dec., Ex. 2, p. 8.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 3
Case Number:  2:15-CV-1004-TSZ

BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204
Telephone 503-228-2525

1035986\v3

1  for personal benefit.[8] This alleged mismanagement purportedly caused the underlying plaintiffs

2  to suffer financial harm and "non-financial damages"[9] and lead to "critical life and safety"

3  hazards.[10] The Underlying Lawsuits broadly sought "[a]n award of compensatory damages, the

4  amount of which is to be determined at trial."[11]

5       The Property Management Agreements ("PMAs") at issue in the underlying lawsuit

6  (attached as exhibits to the various complaints) provided incentive compensation and bonuses

7  based on the completion of work orders.[12]  Each work order was deemed a "pass" or "fail"

8  depending on whether the order was responded to and closed out within the time period provided

9  for that work order's assigned priority level.[13]  The incentives provided in the PMAs were

10  allegedly based on the passage rate for the work orders—*i.e.*, the higher the pass rate, the higher

11  the bonus.[14] The Underlying Lawsuits allege that many of the work orders at issue "relate to life

12  safety issues including smoke detectors, carbon monoxide detectors, mold and other potential

13  safety issues"[15] and "critical life and safety issues (including but not limited to maintenance

14  regarding fire and smoke alarms, and gas and carbon monoxide leaks)."[16]

15       The Underlying Lawsuits allege the AMS Insureds manipulated data relating to

16  responding to and closing out work orders by (1) manipulating the response time and/or closing

17  time in order to satisfy priority requirements in the PMAs, and (2) closing out work orders before

18  the work was completed.[17] According to the complaints, the AMS Insureds altered the data in a

19

20     [8] ECF 51-5 ¶¶ 7, 97, 110, 124, 186, ECF 51-11, ¶¶ 5, 73-74, 88-89, 230, 241, 267.
    [9] ECF 51-11, ¶ 230.

21     [10] *See, e.g.,* ECF 51-5, ¶¶ 7, 124, 186; ECF 51-11, ¶¶ 5, 73-74, 88-89.
    [11] ECF 51-11, ¶ K; ECF 51-5, ¶ F; ("damages sustained by plaintiffs as a result of Defendants' conduct, in

22 an amount to be proven at trial").
    [12] ECF 51, pp. 20-75 (Georgia); ECF 51-6, pp. 56-79, 115-140 (California).  The PMAs were attached as
exhibits to the initial versions of the complaints filed in the Georgia and California Lawsuits and, although not

23 expressly attached, were referenced in subsequent versions of the complaints.
    [13] *See* Mathews Dec., ¶ 14; *see also* ECF 51, pp. 19-75, 51-6, pp 55-79, 114-140.

24     [14] *Id.*
    [15] ECF 51-5, ¶ 124.
    [16] ECF 51-11, ¶ 73.

25     [17] *See* footnotes 8 and 10, *supra*.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 4
Case Number:  2:15-CV-1004-TSZ

BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204
Telephone 503-228-2525

1035986\v3

1  concerted effort to increase the pass rate and trigger higher annual incentive compensation

2  provided in the PMAs and to enhance their reputation with the military families.  Neither the

3  underlying complaints nor any subsequent filings ***ever alleged or contended*** that the AMS

4  Insureds' manipulated data in an effort to cause property damage to the facilities or to create life

5  and safety hazards for the residents; rather, these were the alleged unintended consequence of

6  the AMS Insureds' purported effort to receive more compensation and enhance their

7  reputation.[18]

8    The unintended occurrence of property damage to the military housing facilities and

9  bodily injury to residents—*i.e.*, "critical life and safety" risks—are a repeated theme in the

10  Underlying Lawsuits.[19]  Although the various iterations of the complaints filed in the Underlying

11  Lawsuits never specifically defined the meaning of "life and safety" issues, the pleadings and

12  records filed in the cases made clear that the term was a proxy for property damage and bodily

13  injury.[20] For example, the California Lawsuit expressly cites to ex-employees declarations. Many

14  of these declarations unambiguously recount multiple alleged instances of property damage.[21]

15  The Insurers never investigated these declarations and when presented with them by the AMS

16  Insureds, summarily rejected them.[22]

17    As another example, the California Plaintiffs presented the Declaration of Paul David

18  Cramer, who was the Acting Deputy Assistant Secretary of the Army for Installations, Housing

19  & Partnership.[23]  In his declaration, Cramer testified that the AMS Insureds' actions were

20  designed to increase incentive fees, but had an adverse, yet unintended, effect on the life and

21

22

23

24

25

---

[18] *See* Mathews Dec., Ex. 8, p. 4:12-13 ("Plaintiffs also do not allege that Defendants modified work orders to intentionally harm residents.")

[19] ECF 51-5, ¶¶ 4, 6, 26, 109, 117, 120-123; ECF 51-11, ¶¶ 4, 47, 69, 75-78, 84, 90, 234.

[20] *See, e.g.,* ECF 51 to 51-11; Mathews Dec., Exs. 4-10.

[21] ECF 51-11, ¶¶ 70, 180; *see also* ECF 52-4, pp. 30-36; ECF 52-5; ECF 52-6; ECF 52-7, pp. 1-2; Mathews Dec., Exs. 17-26.

[22] *See, e.g.,* ECF 52-3, pp. 18-19.

[23] ECF 52-7, pp. 7-8.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 5
Case Number:  2:15-CV-1004-TSZ

BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204
Telephone 503-228-2525

1035986\v3

safety issues for the residents.[24]  He went on to cite specific instances of life and safety issues, including "an incident where a family was exposed to carbon monoxide fumes and made claims that this resulted in illness" as well as "an incident involving a fire in the Dogue Creek neighborhood [of Fort Belvoir], resulting in a fatality."[25] He then repeated the underlying plaintiffs' arguments that the property damage and bodily injury was an unintended consequence of the AMS Insureds' purported misconduct. ("…I am not suggesting that these incidents were the *direct* result of conduct by [the AMS Insureds.]) (emphasis added).[26]

The underlying plaintiffs repeatedly mirrored Cramer's testimony in their Underlying Lawsuits in the complaints and subsequent briefing. *See, e.g.,* Mathews Dec., Ex. 6, pp. 8-9, 12, 16, 27-28 (arguing that the alleged manipulation of work order data created "potential life-safety risks for military families"; "closing open work orders prior to completing needed work on the housing of military families, creates a palpable life-safety risk for soldiers and their families"; "findings of widespread work order fraud (intended to increase the property manager's incentive fee compensation)"; arguing that the AMS Insureds "put the lives of soldiers and their families at risk" and "continues to pose grave financial and life-safety risks to the Owners and military families"; arguing the Army (the financial backer of the underlying lawsuit) has a "sharp concern for the life-safety risk presented to its soldiers and their family by the conduct of [the AMS Insureds;" [the] military families are…subject to known life-safety issues as a result of the [AMS Insureds'] dereliction of duty."); *see also* Mathews Dec., Ex. 7, p. 6 ("the soldiers and military families continue to face life-safety risks.")

---

[24] *Id.*
[25] *Id., at 8*
[26] *Id.*

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 6
Case Number:  2:15-CV-1004-TSZ

BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204
Telephone 503-228-2525

1035986\v3

The underlying plaintiffs' commitment to presenting evidence of the claimed life and safety hazards resulted in the California Defendants filing a motion *in limine* to block the presentation of that evidence.[27]  In opposing the motion, the California Plaintiffs argued:

> Concern for the life safety of soldiers is not a theoretical concern. In 2011, a fire killed a young boy at Belvoir and there was suspicion of an impaired smoke detector.  This led to an investigation of the operation of smoke detectors at Belvoir, which found a number of serious issues. * * * A subsequent audit of all 2,000 plus homes at Belvoir revealed serious life safety issues in these houses, maintained by [the AMS Insureds], at more than 50 percent of the houses,

> [The AMS Insureds] attempt to argue that [the Plaintiffs] have not identified specific instances where the closure of a specific work order created a life safety risk. … If the [AMS Insureds] believe that Plaintiffs' evidence of life-safety risks is too attenuated, they may attempt to convince the jury of that view.  But even the emails produced by [the AMS Insureds] reflect serious life safety issues and complaints directly related to [the AMS Insureds] responsiveness to work orders.[28]

In support of this argument, the California Plaintiffs presented many examples of property damage and bodily injury allegedly resulting from the AMS Insureds' misconduct, including an investigative report finding numerous instances of water intrusion, electrical and fire-safety deficiencies, pest problems, elevated carbon monoxide readings, and loose handrails and trip hazards—all and any of which involve actual or potential property damage or bodily injury.[29]

Unrelated to the purported work-order misconduct, the Georgia Plaintiffs also alleged that personal property went missing as a result of the mismanagement of the facilities.[30]  For example, they claimed that appliances and other property were unnecessarily removed from facilities, and that the AMS Insureds gathered and harvested valuable scrap metal and other

---

[27] *See* Mathews Dec., Ex. 8.
[28] *See* Mathews Dec., Ex. 9, p. 2, ln. 23 – p. 2, ln. 17.
[29] *See* Mathews Dec., Ex. 10, pp. 48-298 ("The Villages at Belvoir Environmental & Life Safety Inspection Report, May 2012").
[30] *See* Mathews Dec., Ex. 18, pp. 2-3; ECF 52-6, p. 21, ¶ 15.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 7
Case Number:  2:15-CV-1004-TSZ

BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204
Telephone 503-228-2525

1035986\v3

1    materials from homes that were scheduled for demolition.[31] In other words, the Georgia

2    Plaintiffs claimed that the actions of the AMS Insureds caused the "loss of use of tangible

3    property that may not have been physically injured" (that is, one of the defined meanings of

4    "property damage.").[32]

5    **(C)    Other Lawsuits in California Filed by Military Families Illustrate the Insurers'**
     **Awareness of the Alleged Property Damage and Bodily Injury at Issue in the**
6    **Underlying Lawsuits.**

7            Residents of the subject housing units managed by certain AMS Insureds filed two

8    separate suits alleging they suffered personal injury as a result of the failure to repair or abate

9    conditions at the housing units.[33] These claims track the allegations against the AMS Insureds in

10   the Georgia and California Lawsuits relating to failing to properly respond to or repair work

11   orders by military residents.[34]

12           In those lawsuits, the residents alleged multiple instances of property damage, including

13   water damage, mold, defective windows, and mites.[35] They further allege that due to inadequate

14   or no repairs at all, they became ill.[36] In particular, the residents alleged that they suffered

15   physical injury due not only to the exposure to mold, but also "other improper conditions at the

16   premises."[37]

17           The allegations presented in the *Mosquera* and *Charbonneau* lawsuits further illustrate

18   the "life and safety" allegations at issue here.  The Insurers had knowledge of the alleged bodily

19   injury and property damage in those lawsuits—both were involved with the insureds' request for

20

21

22   [31] *Id.*
     [32] *See* footnote 4, *supra.*
23   [33] Mathews Dec., Exs. 11, 14 (*Mosquera, et al. v. Am. Mgmt. Servs. Cal., Inc., et al.*, Monterey County
     Superior Court, Case Nos. M107388, M113132 ("the *Mosquera* Case") and *Charbonneau, et al. v. Am. Mgmt. Servs.*
24   *Cal., Inc., et al.*, Monterey County Superior Court, Case No. M116203 ("the *Charbonneau* Case")).
     [34] *See id.*
25   [35] Mathews Dec., Ex. 11, ¶ 35, 41-42, 44, 46-48, 50, 52, 56; Ex. 14, ¶ 20-23, 52, 54.
     [36] *Id.*
     [37] Mathews Dec., Ex. 11, ¶ 41.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 8
Case Number:  2:15-CV-1004-TSZ

1  coverage.[38] Despite their awareness of the alleged bodily injury and property damages in those

2  lawsuits, the Insurers denied coverage for the AMS Insureds' claims relating to the Georgia and

3  California Lawsuits based on the assertion that no property damage or bodily injury was alleged

4  in those suits—a position that they knew to be, and is, clearly false.[39]

5  **(D)   Plaintiffs' Tenders to Scottsdale and Lexington and the Insurers' Denial of
       Coverage**

6       The AMS Insureds tendered the Underlying Lawsuits to the Insurers, seeking a defense

7  and indemnity.  Both Insurers repeatedly denied coverage and refused to provide a defense.  As a

8  result of the Insurers' refusals to defend, the AMS Insureds incurred more than $55 million in

9  attorney fees and costs to defend the Underlying Lawsuits.[40]

10      In denying any duty to defend, the Insurers provided little but superficial analysis and

11  conclusory statements. For example, Lexington initially denied the Insureds' tender of the

12  Georgia Lawsuit and provided only a cursory statement of the basis for its denial:

> As the allegations in the Complaint do not meet the definition of
> occurrence, bodily injury, property damage, or personal injury as
> those terms are defined above, no coverage exists for the claim.
> Therefore, Lexington Insurance Company will not provide you
> with either indemnity or defense for this claim.[41]

Aside from this conclusory statement, Lexington did not provide any explanation or analysis of

the reason for its decision to deny coverage.[42]  Importantly, Lexington merely recited the titles of

the claims stated in the Complaint, but did not detail or analyze any specific allegations in the

complaint to determine whether they *conceivably* triggered coverage.[43]   The AMS Insureds

---

[38] *See* Mathews Dec., Exs. 12-13, 15-16.  Indeed, both the current matter and the *Mosquera/Charbonneau* matters were administered by Lexington's parent company, AIG/Chartis. Scottsdale received and responded to all tenders itself and through its coverage lawyers, Selman Breitman—the lawyers in *Mosquera/Charbonneau* and the current matter.
[39] ECF 52, pp. 1-11, 17-27; ECF 52-1; ECF 52-2; ECF 52-3, pp. 4-7, 12-20; ECF 52-4, pp. 1-29; ECF 52-9, p. 1.
[40] Mathews Dec., Exs. 2-3.
[41] ECF 52, p. 4.
[42] *See id.* at pp. 1-5.
[43] *See id.*

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 9
Case Number:  2:15-CV-1004-TSZ

BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204
Telephone 503-228-2525

1035986\v3

requested that Lexington reconsider its denial in light of the extrinsic evidence discussed above as well as additional allegations made against them. In response, Lexington reiterated its denial— repeating the same conclusory reasons for the denial with little to no analysis.

Following the AMS Insureds' tender of the Georgia Lawsuit, Scottsdale denied coverage in a similarly conclusory fashion, stating "the allegations do not meet the definition of 'occurrence', 'Bodily Injury', [or] 'Property Damage'… as defined in the policy." Following this denial, the AMS Insureds repeatedly requested reconsideration of the claim decision, while continuing to provide extrinsic evidence in support of coverage. In response, Scottsdale reiterated its denial of both the Georgia and California Lawsuits—giving itself the benefit of the doubt on all issues of fact and law.

### III. ARGUMENT

**(A)** **Under Washington Law, an Insurer Must Defend Where there is Any Conceivable Possibility that the Underlying Lawsuit Alleges Facts that Could Subject the Insured to Covered Liability**

The evaluation of an insurer's duty to defend under Washington law is a decidedly pro-policyholder exercise. "While the duty to indemnify exists only if the policy covers the insured's liability, the duty to defend is triggered if the insurance policy *conceivably* covers allegations in the complaint."[44] If a complaint, construed liberally, alleges *facts* which could ultimately impose a covered liability on the insured, the insurer must defend, regardless of the specific relief sought or the claims asserted.[45] "It is a cornerstone of insurance law that an insurer may never put its own interests ahead of the insured's."[46] Accordingly, courts analyzing the duty to defend under Washington law will construe any ambiguities liberally in favor of triggering the insurer's

---

[44] *Expedia, Inc. v. Steadfast Ins. Co.*, 180 Wash.2d 793, 802 (2014) (citing *Am. Best Food, Inc. v. Alea London, Ltd.*, 168 Wash.2d 398, 404 (2010) (emphasis added)).

[45] *Id.; see also Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wash.2d 869, 878 (1990) (coverage "does not hinge on the form of action taken or the nature of relief sought").

[46] *Expedia, supra* at 803.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 10
Case Number:  2:15-CV-1004-TSZ

defense obligation.[47] "The insurer is entitled to investigate the facts and dispute the insured's interpretation of the law, *but if there is any reasonable interpretation of the facts or the law that could result in coverage, the insurer must defend*."[48] "When the facts or the law affecting coverage is disputed, the insurer may defend under a reservation of rights until coverage is settled in a declaratory action." *Id.* But unless and until a court of competent jurisdiction declares that there is no conceivable possibility of coverage, the insurer must defend. Indeed, the Washington Supreme Court has long recognized that the duty to defend is "one of the principal benefits of the liability insurance policy[,]" and insurers must give their policyholders every "benefit of the doubt" in assessing their defense obligation.[49]

Well-established Washington law provided Scottsdale and Lexington with abundantly clear direction in how to respond to the AMS Insureds' tender of the Underlying Lawsuits. The Insurers were to scrutinize the facts alleged by the underlying plaintiffs. Any doubt as to the facts or the law was to be resolved in favor of the insured. If the facts alleged could *conceivably* lead to covered damages, the Insurers had a duty to defend. If the Insurers believed that contested facts or law could eventually lead to a finding of no coverage, they were free to defend under a reservation of rights while filing a declaratory relief suit as to coverage. But Washington law prohibits the Insurers from doing what they did here: simply denying coverage and leaving the AMS Insureds without the defense that they had bargained for.

///

///

///

///

///

---

[47] *Id.*
[48] *Am. Best Food*, *supra* at 405 (emphasis added).
[49] *Woo v. Fireman's Fund Ins. Co.*, 161 Wash.2d 43, 54, 64 (2007).

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 11
Case Number:  2:15-CV-1004-TSZ

BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204
Telephone 503-228-2525

1035986\v3

1

2

**(B)      The Underlying Lawsuits Include Factual Allegations That Could Subject The Insureds To Liability Covered by the Scottsdale and Lexington Policies, Triggering the Duty to Defend**

3

**1.      Factual Allegations in the Underlying Complaints Could Result in Liability Arising From "Bodily Injury" or "Property Damage"**

4

5       Liberally construed in favor of coverage—as they must—the Underlying Lawsuits

6  alleged facts that could have potentially resulted in an award of covered damages. For example,

7  the Fifth Amended Complaint in the California Lawsuit alleged the AMS Insureds prematurely

8  closed open work orders resulting in life and safety risks, including those relating to fire alarms

9  and gas and carbon monoxide leaks. *See, e.g.,* ECF 51-11 (alleging "very real life and safety

10  risks" caused by "closing open work orders before the work was complete," ¶ 5; . describing

11  "critical life and safety issues" as those including "maintenance regarding fire and smoke alarms,

12  and gas and carbon monoxide leaks," ¶ 73;  alleging that inaccurate work-order data causes the

13  Owner to "have no way of ensuring that critical maintenance requests, including those related to

14  the life and safety of the military residents, are appropriately addressed," ¶ 74; alleging that the

15  AMS Insureds' work order misconduct " has posed and continues to pose a direct risk to the life

16  and safety of the military residents," including issues concerning "smoke detectors, gas and

17  carbon monoxide leaks, and other potential safety issues," ¶ 88; alleging an investigation

18  revealed that "many of the homes had life safety issues that [the AMS Insureds], responsible for

19  the repair and maintenance of the military housing, had failed to remedy or had allowed to occur

20  and continue," ¶ 89.)

21       The Fifth Amended Complaint in the Georgia Lawsuit contained similar allegations. *See,*

22  *e.g.,* ECF 51-5 (the "widespread practice of falsifying work order data and closing out work

23  orders even when work had not been done creates serious concerns regarding whether work

24  orders, including work orders related to life safety issues, have been properly addressed by [the

25  AMS Insureds], ¶ 7; the AMS Insureds' employees "engaged in a scheme to harvest and sell

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 12
Case Number:  2:15-CV-1004-TSZ

BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204
Telephone 503-228-2525

1035986\v3

valuable scrap metal and potentially other materials of value from Benning Project Homes scheduled for demolition and to use the proceeds for their own benefit," ¶ 97; the AMS Insureds' "falsification of work order data has posed, and continues to pose, a risk to the life and safety of the military residents" including those relating to "life safety issues include[ing] smoke detectors, carbon monoxide detectors, mold and other potential safety issues," ¶ 125; detailing AMSE's obligation under the PMA to "to accurately report data in connection with its response to resident work orders, including but not limited to work orders that raised critical life and safety issues for the residents," ¶ 187.)

In making these allegations, the Underlying Lawsuits opened the door to an award of damages based on bodily injury or property damage. Under Washington law, once that door was opened, the Insurers had a duty to defend the Insureds.[50] Courts in other jurisdictions hold that allegations of exposure to health and safety risks can be sufficient to allege the possibility of covered "bodily injury."[51] No court in Washington has held otherwise and, under Washington law, the AMS Insureds are entitled to the benefit of that authority.[52] The allegations here of "critical life safety issues" are similarly sufficient to raise the possibility of damages arising from bodily injury and/or property damage. There is no need to resort to extrinsic evidence. The Insurers had a duty to defend based on the eight corners of the complaints and policies.

### 2. Factual Allegations in the Underlying Complaints Could Result in Liability Arising From an Accidental "Occurrence"

The Policies provide coverage for damages arising from bodily injury or property damage that is caused by an accidental "occurrence." Here, it is conceivable that the AMS Insureds could ultimately be liable for damages that arose from an occurrence. Under Washington law, the unintended result of even intentional conduct can give rise to an "occurrence." Moreover, the

---

[50] *Expedia*, *supra*, 180 Wash.2d at 802 ("the duty to defend is triggered if the insurance policy conceivably covers allegations in the complaint").

[51] *See, e.g.*, *U.S. Fidelity & Guar. Co. v. Korman Corp.*, 693 F.Supp. 253, 259 (E.D. Pa. 1988).

[52] *Woo, supra*, at 60; *see also, Am. Best Food, supra,* at 410-11.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 13
Case Number:  2:15-CV-1004-TSZ

Underlying Lawsuits included claims for breach of fiduciary duty. Under California and Georgia law, those claims could have been proven without evidence of intent. Accordingly, the Insurers' duty to defend was triggered.

(a)    **Intentional Conduct that Results in Unintended Bodily Injury or Property Damage Qualifies as an Occurrence**

In Washington, intentional conduct that results in unintended bodily injury or property damage constitutes an occurrence.[53] Under *Queen City,* the Insurers must prove, as a matter of law, that the AMS Insureds intended the resultant property damage and bodily injury at issue in the Underlying Lawsuits—a burden they cannot satisfy.

In *Queen City,* the Washington Supreme Court examined a policy defining an occurrence as "an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage."[54] In determining whether an objective or subjective standard applied to an occurrence policy—like here—the court held that the "policy language is at least ambiguous as to whether an objective or a subjective standard applies."[55] Because ambiguities are resolved in favor of the insured, the court held that a subjective standard applied.[56] Although the occurrence language in *Queen City* was different than in the policies here, the court's analysis did not hinge upon those differences: "if the insurers wanted an objective standard to apply, they could easily have drafted language to

---

[53] *See Queen City Farms, Inc. v. Central Nat'l Ins. Co. of Omaha*, 126 Wash.2d 50, 69, (1994) ("injury or damage resulting from acts of negligence, even though precipitated by an intentional act, would be covered under the occurrence clause").

[54] *Id.* at 59.

[55] *Id.* at 68.

[56] *Id.* at 68; *see also Overton v. Consolidated Ins. Co.*, 145 Wash.2d 417, 425 (2002) (holding that whether an event was expected and therefore not an occurrence depends on the "subjective state of mind of the insured with respect to the property damage"); *Cle Elum Bowl, Inc. v. North Pacific Ins. Co.*, 96 Wash.App. 698, 704 (1999) ("[w]hether or not an insured 'expected' a particular event is a subjective test, requiring evidence of the insured's state of mind").

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 14
Case Number:  2:15-CV-1004-TSZ

that effect."[57] Like in *Queen City*, the Insurers here could have included an objective standard. But they did not – the Insurers did not provide any standard at all.

More recently, the Washington courts have clarified that "[t]o prove that an intentional act was not an accident, the insurer must show that it was deliberate, meaning done with awareness of the implication or consequences of the act."[58] In *Hayles*, the insured's intentional act of turning on an irrigation system destroyed an onion crop. The insurer argued that the unauthorized and intentional act of turning on the irrigation system—when informed by the onion field tenant not to turn on the irrigation system—failed to qualify as an occurrence. The court rejected this argument—which the Insurers repeat here—because the insurer was unable to satisfy its burden to prove that the insured's intentional act was done with awareness of the consequences of the act.

At the duty to defend stage, where all issues must be resolved in favor of the AMS Insureds, the Insurers cannot prove as a matter of law that the allegations, policy language, and controlling law do not "conceivably" result in a "potentially" covered liability. The Insurers cannot demonstrate that the AMS Insureds had any subjective intent to cause the alleged bodily injury or property damage. Indeed, there are *no allegations or claims* that the AMS Insureds ever intended the alleged bodily injury or property damage at issue in the Underlying Lawsuits; rather, the underlying plaintiffs consistently argued that the alleged bodily injury or property damage was an unintended consequence of the AMS Insureds' purported wrongdoing. Because the Insurers cannot satisfy their burden to prove that the AMS Insureds had any subjective intent to cause the alleged injuries, this Court should find, as a matter of law, that the Underlying Lawsuits allege conduct that qualifies as an occurrence.

---

[57] *Id.* at 67 (citing *Aetna Cas. & Sur. Co. v. Dichtl*, 78 Ill.App.3d 970, 34 Ill.Dec. 759, 398 N.E.2d 582 (1979)).

[58] *Id.* at 538. *Nationwide Mut. Ins. Co. v. Hayles, Inc.*, 136 Wash.App. 531, 538 (2007).

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO DEFENDANTS' DUTY TO DEFEND - 15
Case Number:  2:15-CV-1004-TSZ

BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204
Telephone 503-228-2525

1035986\v3

(b)     **Liability for Breach of Fiduciary Duty Can Arise from Unintentional Conduct**

Both the California Lawsuit and the Georgia Lawsuit include claims based on the Insureds' alleged breach of fiduciary duty. Neither state requires proof of intentional conduct to establish liability for breach of fiduciary duty. Indeed, under California law, "[b]reach of this fiduciary duty, which may occur without any intent or expectation to cause harm, is not necessarily a willful act[.]"[59] Similarly, under Georgia law, a fiduciary relationship "arises where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc."[60] The fiduciary relationship can be created by law or the facts of a particular situation, and "may be found wherever one party is justified in reposing confidence in another."[61] Nothing in Georgia law requires intent, expectation of harm, or a willful act, and Georgia courts have regularly adjudicated cases alleging "negligent breach of fiduciary duty."[62]

In wrongfully denying their duty to defend, the Insurers unilaterally characterized the Underlying Lawsuits as strictly involving intentional conduct—giving themselves every benefit of the doubt. This tactic has been consistently rejected by Washington courts. Under Washington law, the Insurers were required to construe the Underlying Lawsuits liberally, looking for "any reasonable interpretation of the facts or the law that could result in coverage."[63] Here, the breach of fiduciary claims specifically alleged that the underlying plaintiffs suffered both "financial and non-financial damages," and the Underlying Lawsuits generally sought broad and wide-ranging

---

[59] *Unified Western Grocers, Inc. v. Twin City Fire Ins. Co.*, 457 F.3d 1106, 1113-14 (9th Cir. 2006).
[60] *Douglas v. Bigley*, 278 Ga.App 117, 120, 628 S.E.2d 199 (2006).
[61] *Id.*
[62] *See, e.g.*, *Paul v. Destito*, 250 Ga.App.631, 550 S.E.2d 739 (2001).
[63] *Am. Best Food, supra*, 168 Wash.2d at 405.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 16
Case Number:  2:15-CV-1004-TSZ

relief, including "[a]n award of compensatory damages, the amount of which is to be determined at trial."

These damages were based on breach of fiduciary claims that could be proven through unintentional conduct. Under these circumstances, the Insurers' only good-faith option was to provide their insureds with a defense.

**(C)** **Extrinsic Evidence Demonstrates the Possibility that the Insureds Could Be Liable for Covered Damages Arising From the Underlying Lawsuits, Triggering the Duty to Defend**

Under Washington law, "[t]he duty to defend is generally determined from the 'eight corners' of the insurance contract and the underlying complaint."[64] If the underlying complaint alleges any facts that could conceivably lead to covered damages, the insurer must defend.[65] As discussed above, both of the Underlying Lawsuits alleged facts that could conceivably lead to an award of damages based on accidental bodily injury or property damage. Accordingly, based on the "eight corners" analysis alone, the Insurers breached their duty to defend.

Washington courts will also allow the use of extrinsic evidence to establish an insurer's duty to defend under two general circumstances—both of which could apply here.[66] "First, if coverage is not clear from the face of the complaint but coverage could exist, the insurer must investigate and give the insured the benefit of the doubt on the duty to defend."[67] Here, if the allegations of the underlying complaint were in any way unclear, the Insurers had an obligation to investigate. A reasonable investigation would have revealed publically available facts showing that the Underlying Lawsuits involved allegations of unexpected and unintended bodily injury and/or property damage.

---

[64] *Expedia*, *supra*, 180 Wash.2d at 803.

[65] *Id*

[66] In contrast, under Washington law, extrinsic evidence can never be used to support an insurer's denial of a defense.

[67] *Id.*, citing *Woo*, *supra*, at 53.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 17
Case Number:  2:15-CV-1004-TSZ

BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204
Telephone 503-228-2525

1035986\v3

"Second, if the allegations in the complaint conflict with facts known to the insurer or if the allegations are ambiguous, facts outside the complaint may be considered."[68] Here, the Insureds specifically provided the insurers with extrinsic facts demonstrating allegations of accidental property damage and/or bodily injury, triggering their duty to defend.

As discussed above, the Underlying Lawsuits' reference to life and safety issues (including references to specific hazards) at the military housing facilities was sufficient to trigger the duty to defend under Washington's "conceivability" test. Nevertheless, because the complaints were unclear as to what the underlying plaintiffs were alleging with regard to potential life and safety issues, the Insurers' duty to investigate the allegations was triggered. An adequate investigation by the Insurers would have revealed that "life safety issues" was shorthand for claims involving unexpected and unintended bodily injury and/or property damage arising from the Insureds' alleged, and potentially negligent, misconduct.

For instance, the Fifth Amended Complaint in the California Lawsuit was specifically tendered to the Insurers.[69] That Complaint made specific reference to "sworn affidavits and other admissions" that supported the plaintiffs' claims regarding work order manipulation.[70] But the Insurers made no effort to investigate these affidavits (which were provided to them by the AMS Insureds). Had they done so, they would have seen evidence that the Underlying Lawsuits involved serious concerns about safety issues, as well as potential property damage and bodily injury.[71]

---

[68] *Expedia, supra*, at 803–04.
[69] *See* ECF 52-10.
[70] ECF 51-11, ¶70.
[71] *See*, *e.g.*, ECF 52-4, p. 33-34, ¶ 10 ("I was especially uncomfortable doing this because I knew that meant the work hadn't been done, which could pose a risk to the safety of our residents"); ECF 52-5, p. 1-2, ¶ 3 (detailing resident complaints that 30-40% of residents informed her that "work was not complete"); ECF 52-6, p. 36, ¶ 9 (identifying concerns with "mold" remediation); ECF 52-6, p. 24-26, ¶ 9, 12-14 (testifying that required work was not performed even though the work order was "closed out" and describing concerns about the qualifications of "vendors…to remediate mold"); Mathews Dec., Ex. 18, p. 2-3 (detailing his understanding that employees were "picking up scrap metal on company time storing it and later selling it"); Mathews Dec., Ex. 19, p. 8, ¶ 8 (detailing resident complaints that "mold issues" were not addressed); Mathews Dec., Ex. 20, p. 13, ¶ 12

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 18
Case Number:  2:15-CV-1004-TSZ

BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204
Telephone 503-228-2525

1035986\v3

1      A simple review of the publically available court files would have shown the Insurers that

2 unintended and unexpected bodily injury and property damage were frequent and heavily

3 litigated themes in each of the Underlying Lawsuits. For example, in the California Lawsuit,

4 Acting Deputy Assistant Secretary of the Army Paul David Cramer submitted declaration

5 testimony documenting both bodily injury and property damage at properties managed by the

6 Insureds.[72] Mr. Cramer testified about claims arising from residents' alleged exposure to carbon

7 monoxide fumes, an allegation that raises the potential for liability arising from covered bodily

8 injury. Mr. Cramer also testified about a house fire and resulting fatality which may have been

9 related to negligent inspection of or repairs to smoke alarms. Again, this testimony raises, at a

10 minimum, the possibility that the Insureds could be legally obligated to pay damages because of

11 accidental bodily injury or property damage, triggering the Insurers' duty to defend.

12      The Insurers' failure to properly investigate, however, did not insulate them from

13 knowledge of extrinsic facts that support coverage for the Insureds. The Insurers were well

14 aware of facts outside of the Complaints—albeit due to no actions on their part—that

15 unequivocally demonstrate that the Underlying Lawsuits were about more than intentional

16 conduct and financial wrongdoing, and, instead, included serious allegations involving bodily

17 injury and/or property damage. Because of the Insurers' head-in-the-sand approach, the AMS

18 Insureds were required to—and did— provide the Insurers with a number of the declarations that

19 had been filed in support of various motions in the Underlying Lawsuits and referenced in the

20 Fifth Amended Complaint, as discussed above. Those declarations further amplify the real nature

21

22   (testifying that technicians "paint[ed] over the mold"); ECF 52-6, p. 29, 31, ¶¶ 7, 15 (testifying that work orders

23 were prematurely closed, even if the work was "critical to the safety of the home and its residents," and further recounting other property damage never addressed in the form of "cracked countertops" and "melting siding"); ECF

24 52-6, p. 21, ¶ 15 (detailing that property that "should have been transferred went missing" and appliances from the homes were "dispose[d] of…that were in largely…good and usable shape"); Mathews Dec., Ex. 21, p. 16, ¶¶ 7-8

25 (testifying about inadequate abatement of "mold" and that residents became "sick" "because of mold issues"); Mathews Dec., Ex. 25 p. 4-5, ¶ 12 (describing that he was never "asked to investigate what was causing the mold or to properly repair it").

[72] *See* ECF 52-7, pp. 7-8.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 19
Case Number:  2:15-CV-1004-TSZ

BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204
Telephone 503-228-2525

1035986\v3

of the claims asserted against the AMS Insureds: the claims were motivated, from the very beginning, by real concerns about life and safety issues at the military housing facilities.

Similarly, the AMS Insureds provided the Insurers with a copy of the Cramer Declaration, discussed above.[73] That Declaration references specific instances of bodily injury and property damage (illness resulting from carbon monoxide poisoning; a fire and resulting death).[74] More significantly, Mr. Cramer's testimony shows, again, that concern for life and safety issues was a key component of the Underlying Lawsuits: "the significance of responding to work orders and of the Owner and Army being able to trust that work orders (including work orders involving life safety issues) have been completed by the property manager."[75]

Moreover, as discussed above, the California Plaintiffs addressed bodily injury and property damage in response to a motion *in limine* seeking to block introduction of such evidence at trial.[76] That response, readily available to the Insurers in court files, again stressed the serious life safety issues that allegedly arose from failure to properly address work orders. The California Plaintiffs specifically responded to the motion arguing that life and safety issues did not present a "theoretical concern." The California Plaintiffs then cited evidence which they intended to put on at trial, including a 2011 fire that killed a young boy, which may have resulted from an impaired smoke detector. Death is, undeniably, bodily injury, just as a burned residence is undeniably property damage. The California Plaintiffs further previewed similar evidence, including an investigative report identifying finding numerous instances of water intrusion, electrical and fire-safety deficiencies, pest problems, elevated carbon monoxide readings, and loose handrails and trip hazards—all and any of which involve actual or potential property damage or bodily injury. As demonstrated by the California Plaintiffs' intended evidence, the

---

[73] *See* ECF 52-10.
[74] *See* 52-7, pp. 7-8.
[75] *Id.* at p. 8, ¶ 7.
[76] Mathews Dec., Exs. 9-10.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 20
Case Number:  2:15-CV-1004-TSZ

BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204
Telephone 503-228-2525

1  Underlying Plaintiffs alleged facts which could, at least conceivably, lead to liability for

2  unintended bodily injury and/or property damage. That is more than sufficient to trigger the

3  Insurers' duty to defend.

4        Finally, the Insurers were also aware of specific claims involving bodily injury and

5  property damage at the California military housing properties.[77] Indeed, the Insurers were well

6  aware of separate litigation filed by military residents, which specifically alleged multiple

7  instances of property damage, including water damage, mold, defective windows, and mites.

8  They further allege that due to inadequate repairs (or no repairs at all), they became ill as a result.

9  In particular, the residents alleged that they suffered physical injury due not only to the exposure

10  to mold, but also "other improper conditions at the premises."

11        Both *Mosquera* and *Charbonneau* were specifically tendered to the Insurers.[78] It cannot

12  be disputed that both Insurers were intimately aware of the bodily injury and property damage

13  allegations. This extrinsic evidence does more than provide an independent basis to trigger the

14  Insurers' duty to defend. Rather, the extrinsic evidence available to the Insurers, whether through

15  their own investigation or provided by the AMS Insureds, shows that the Underlying Complaints

16  themselves, liberally construed in favor of coverage, included allegations that could conceivably

17  lead to an award of damage based on bodily injury and/or property damage. As the Washington

18  Supreme Court explained in *Woo v. Fireman's Fund*, '[t]he insurer's duty to defend is triggered

19  if a complaint is ambiguous. The insured must be given the benefit of the doubt if it is not clear

20  *from the face of the complaint* that the policy does not provide coverage. In short, if it is not clear

21  that the complaint does *not* contain allegations that are covered by the policy, the insurer has a

22  duty to defend."[79] An insurer cannot simply rely on its own interpretation of the law or the facts

23  in assessing coverage. Rather, "the duty to defend requires an insurer to give the insured the

24

25

---

[77] Mathews Dec., Exs. 11, 14.
[78] Mathews Dec., Exs. 12-13, 15-16.
[79] *Woo*, *supra*, at 64 (citations omitted; emphasis in original).

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 21
Case Number:  2:15-CV-1004-TSZ

BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204
Telephone 503-228-2525

1035986\v3

benefit of the doubt when determining whether the insurance policy covers the allegations in the complaint."[80] The Insurers should have given their Insureds the benefit of *every* doubt and provided a defense; instead they refused to investigate, and refused to view all allegations, evidence, and law in favor of the AMS Insureds—in clear disregard of Washington law.

## IV. CONCLUSION

Under Washington law, an insurer must defend any lawsuit that could *conceivably* result in an award of covered damages. Here, the Complaints in the Underlying Lawsuits broadly sought an award of compensatory damages. The Complaints alleged facts that, broadly construed, could conceivably have resulted in an award of damages arising from accidental and unintended property damage and/or bodily injury. Extrinsic evidence further explained the nature of the otherwise vague claims, showing that the Underlying Lawsuits specifically included litigation involving bodily injury and property damage. Under these circumstances, the Insurers had a duty to defend. The AMS Insureds respectfully request that this Court award partial summary judgment in favor of the plaintiffs as to the Insurers' duty to defend.

BALL JANIK LLP

Dated: November 6, 2015

*s/Kyle A. Sturm*
Kyle A. Sturm, admitted *pro hac vice*
ksturm@balljanik.com
Kevin S. Mapes, WSBA 40416
kmapes@balljanik.com
Nicholas Thede, WSBA #43765
nthede@balljanik.com
James C. Prichard, WSBA #30077
jprichard@balljanik.com
Ball Janik LLP
101 SW Main St., Ste. 1100
Portland, OR 97204
Tel: (503) 228-2525

---

[80] *Id.* at 60.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 22
Case Number:  2:15-CV-1004-TSZ

1

BOWERS FOREMAN PLLC

2

s/Linda L. Foreman
Linda L. Foreman, WSBA 11817

3

linda@lindaforeman.com

4

Bowers Foreman PLLC
5825 60th St. SE

5

Snohomish, WA 98290
Tel: (425) 822-7197

6

7

Attorneys for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 23
Case Number:  2:15-CV-1004-TSZ

1035986\v3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CERTIFICATE OF SERVICE

I certify that on November 6, 2015 I electronically filed the foregoing paper with the Clerk of the Court for the United States District Court for the Western District of Washington by using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: November 6, 2015

*s/Kyle A. Sturm*
Kyle A. Sturm, admitted *pro hac vice*
Attorneys for Plaintiffs

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO DEFENDANTS' DUTY TO
DEFEND - 24
Case Number:  2:15-CV-1004-TSZ

BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204
Telephone 503-228-2525

1035986\v3