HONORABLE THOMAS S. ZILLY

1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
9                  AT SEATTLE

| | |
|---|---|
| 10  AMERICAN MANAGEMENT SERVICES<br>EAST, LLC, a Washington limited liability<br>11  company, AMERICAN MANAGEMENT<br>SERVICES LLC, a Washington limited liability<br>12  company, AMERICAN MANAGEMENT<br>SERVICES CALIFORNIA INC., a Washington<br>13  corporation, GOODMAN REAL ESTATE, INC.,<br>a Washington corporation, formerly d/b/a<br>14  GOODMAN FINANCIAL SERVICES, INC.,<br>STANLEY HARRELSON, an individual, JOHN<br>15  GOODMAN, an individual, PINNACLE IRWIN<br>LLC, a Washington limited liability company,<br>16  PINNACLE MONTEREY LLC, a Washington<br>limited liability company,<br>17<br>                Plaintiffs,<br>18<br>        v.<br>19<br>SCOTTSDALE INSURANCE COMPANY, a<br>20  Delaware corporation, and LEXINGTON<br>INSURANCE COMPANY, a Delaware<br>21  corporation,<br>22<br>                Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   NO. C15-cv-01004<br><br>DEFENDANT SCOTTSDALE INSURANCE<br>COMPANY'S OPPOSITION TO MOTION<br>FOR PARTIAL SUMMARY JUDGMENT |

23        I.     **INTRODUCTION**

24        Plaintiffs—American Management Services LLC and its affiliates (collectively "AMS")

25  —ask this Court to impose on Scottsdale Insurance Company ("Scottsdale") a duty to fund

26  AMS's litigation costs in a commercial dispute arising from fraud and other intentional

misconduct.   Scottsdale insured AMS against liability claims for bodily injury and property damage caused by accidental occurrences.   Scottsdale did not agree to underwrite AMS's business quarrels or to immunize it against the consequences of claimed corrupt business practices.[1]   The Court should deny AMS's motion and grant Scottsdale's motion for summary judgment.

## II.   ARGUMENT[2]

The material facts are stated in detail in the parties' cross motions and are undisputed. *See* Dkt. Nos. 53, 57, 59.   The case thus turns on a legal question: whether the allegations in the underlying complaints—*Monterey Bay Military Housing LLC ("MBMH") et al. v. Pinnacle Monterey LLC et al.* in California, and *Fort Benning Family Communities LLC ("FBFC") and Fort Belvoir Residential Communities LLC ("FBRC") v. American Management Services East LLC et al.* in Georgia—sought potential covered liability.   They did not.

### A.   AMS attempts to rely on irrelevant documents.

As an initial matter, Scottsdale objects to consideration of certain materials cited in AMS's motion.   In particular, the Fifth Amended Complaint in the MBMH action ("MBMH 5th AC") was never tendered to Scottsdale.   Moreover, several documents that AMS considers "extrinsic evidence" were never previously called to Scottsdale's attention.

#### 1.   The MBMH 5th AC was not tendered.

AMS mistakenly claims that the MBMH 5th AC was tendered to Scottsdale.   *See* Dkt. No. 59 at 21.   For this proposition, it cites a letter dated April 15, 2015.   *See id.* (citing Dkt. No. 52-10).   This letter challenges Scottsdale's denial based on the MBMH *Fourth* Amended

---

[1] AMS was found in the Fort Benning action to have committed intentional misconduct as a matter of law.   *See American Management Services East, LLC v. Fort Benning Family Communities, LLC*, 333 Ga. App. 664, 774 S.E. 2d 233 (2015).   And it admitted the basis for the related claims in the MBMH action.   Dkt. No. 54 at 13.

[2] At 8:59 a.m. on December 11, 2015 AMS filed Plaintiffs' Praecipe making seven corrections to its Motion for Summary Judgment.   Scottsdale has made an effort to consider the corrections, the impact they have on its Opposition and to make changes to its Opposition as needed in order to file this Opposition on December 11, 2015.   Nevertheless, Scottsdale reserves the right to make additional changes if they are deemed necessary in the future.

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 2
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

Complaint. Dkt. No. 52-10, *passim*. It mentions in footnotes that MBMH had recently obtained leave to file its 5th AC. *Id.* at 3, 13. This filing did not occur until the next day. Dkt. No. 51-11.

The MBMH 5th AC was never tendered to Scottsdale. Greer decl.[3] at ¶¶ 3–4. And yet, AMS expressly limits its motion to the claim that the Fifth Amended Complaint in each action triggered a duty to defend. Dkt. No. 59 at 4 n. 1. Because AMS offers no authority for the notion that an insurer can be required to defend against a complaint that was never tendered to it, AMS's motion must be denied as to the MBMH action on this ground alone.[4]

2.   The Court should disregard materials that were not called to Scottsdale's attention before the filing of this lawsuit.

AMS asks this Court to find a duty to defend based on materials that were not known to Scottsdale when it made its coverage determination. An insurer can consider extrinsic information only if: "'(a) the allegations are in conflict with facts known to or readily ascertainable by the insurer or (b) the allegations of the complaint are ambiguous or inadequate.'" *Atl. Mut. Ins. Co. v. Roffe, Inc.*, 73 Wn. App. 858, 862, 872 P.2d 536 (1994) (quoting *E-Z Loader Boat Trailers, Inc. v. Travelers Indem. Co.*, 106 Wn.2d 901, 908, 726 P.2d 439 (1986)). Although the declarations that AMS called to Scottsdale's attention became "facts known to or readily ascertainable by" Scottsdale, the following items did not:

1.   The declarations attached to the Matthews declaration. Dkt. Nos. 66-1, 66-2. The attorney submitting these exhibits does not claim that they were ever previously called to Scottsdale's attention. Dkt. No. 60. Also, AMS fails to identify at what date Exhibits 17–25 were publicly available. *See* Dkt. No. 66-1.

2.   AMS's motion in limine in the MBMH action and the response in opposition. Dkt. No. 65. These pleadings were not filed until after AMS filed this lawsuit.

---

[3] The Greer Declaration in opposition to AMS's motion is filed together with this response.

[4] In any event, none of the new allegations in the MBMH 5th AC raised any covered claims. It essentially provided new details regarding the underlying plaintiffs' racketeering allegations and claimed fraudulent transfer as a RICO predicate. *See* Dkt. No. 51-11 at 41–46. It also alleged that AMS employees were instructed to destroy or steal documents, that the Army supported the removal of AMS as property manager, and that AMS senior management knew about AMS's fraudulent work-order scheme. *Id.* at 12, 22.

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 3
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

3. The April 2014 Government Accountability Office ("GAO") report.   Dkt. No. 67-2.   Again, the attorney submitting this exhibit does not claim that it was ever called to Scottsdale's attention before the present motion. *See* Dkt. No. 67.

Scottsdale therefore objects to consideration of these materials because they are irrelevant.   In any event, as explained below, these materials do not support AMS's position. Rather, they merely confirm that the underlying plaintiffs alleged fraud and other intentional misconduct that was not covered under the Scottsdale policies.

**B.   AMS misstates the legal standard for triggering the duty to defend.**

Another inherent flaw in AMS's motion is its faulty understanding of what must be alleged in a complaint in order to trigger an insurer's duty to defend.   The burden is on the insured to show that the underlying complaint "alleges facts which could, if proven, impose liability upon the insured within the policy's coverage." *Expedia, Inc. v. Steadfast Ins. Co.*, 180 Wn.2d 793, 802–03, 329 P.3d 59 (2014) (quoting *Am. Best Food, Inc. v. Alea London, Ltd.*, 168 Wn.2d 398, 404, 229 P.3d 693 (2010)).   The duty to defend, while broad, does not arise merely because the underlying plaintiffs *could have* raised covered allegations.

**The duty to defend is not triggered by the possibility of additional allegations.**   AMS argues that the duty to defend can arise "regardless of the specific relief sought or the claims asserted." Dkt. No. 59 at 10 (citing *Expedia*, 180 Wn.2d at 802).   But *Expedia* does not support this proposition.   There, Expedia was sued for collecting the wrong amount of local occupancy taxes from its hotel customers. *Expedia*, 180 Wn.2d at 797–98.   Its insurance policy broadly covered any liability for damages "arising out of a negligent act or negligent omission . . . in the conduct of Travel Agency Operations." *Id.* at 798 (alteration in original).   Because it was conceivable that Expedia "could be found to be liable under the underlying complaints, yet not have engaged in willful misconduct," the claim was conceivably covered. *Id.* at 805.

Here, in contrast, the underlying plaintiffs claim that AMS's fraudulent practice of falsifying work orders created life-safety hazards. *Expedia* does not help AMS because the

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 4
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

1    underlying plaintiffs specifically alleged willful misconduct.  Further, nothing in *Expedia* can be

2    read to support AMS's misguided assumption that a duty to defend can arise simply because the

3    underlying plaintiffs *could have* raised a claim for property damage.

4         No Washington case holds that an insurer must speculate as to un-pleaded facts, and such

5    a rule has been overwhelmingly rejected by courts around the nation.  *See* ALLAN D. WINDT, 1

6    INSURANCE CLAIMS AND DISPUTES § 4:1 (6th ed.) (citing more than fifty cases, at fn 37–42, for

7    the rule that an insurer is not required to speculate about whether a covered claim is being made

8    and that the fact the complaint could be amended to assert a covered claim is irrelevant); *see also*

9    *Connecticut Indem. Co. v. DER Travel Service, Inc.*, 328 F.3d 347, 350–51 (7th Cir. 2003) ("it is

10   the actual complaint, not some hypothetical version, that must be considered").  If Washington

11   law is silent on an issue, and "the persuasive authority supports the insurer's denial of the duty to

12   defend," then there is no legal uncertainty or ambiguity that would require construction in favor

13   of the insured.  *Grange Ins. Ass'n v. Roberts*, 179 Wn. App. 739, 764, 320 P.3d 77 (2013) *review*

14   *denied*, 180 Wn.2d 1026, 328 P.3d 903 (2014) (citing *Alea*, 168 Wn.2d at 404).  Given the lack

15   of Washington support for AMS's position, the nationwide rejection of AMS's proposed rule

16   militates against a duty to defend.  *See id.* (no duty to defend where the overwhelming majority

17   of jurisdictions would not consider the claim to involve covered acts).

18        **The substance of the underlying litigation is a claim for fraud and other uncovered**

19   **intentional misconduct.**  AMS also cites *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869,

20   784 P.2d 507 (1990).  AMS relies on an out-of-context statement that "coverage 'does not hinge

21   on the form of action taken or the nature of the relief sought [. . .].'"  Dkt. No. 59 at 10 n. 45

22   (quoting *Boeing*, 113 Wn.2d at 878).  This case likewise does not help AMS.

23        *Boeing* arose from an environmental-cleanup action.  The certified question was whether

24   "the environmental response costs paid or to be paid by the insureds . . . constitute 'damages'

25   within the meaning of the [policies]."  *Boeing*, 113 Wn.2d at 873.  The insurers contended that

26   "damages" should be given a "legal technical meaning" and that the court should distinguish

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 5
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

1   "between law remedies, excluding restitution-type law damages." *Id.* at 876.   The court

2   disagreed, explaining that "coverage does not hinge on the form of action taken or the nature of

3   relief sought, but on an actual or threatened use of legal process to coerce payment or conduct by

4   a policyholder." *Id.* at 878 (quoting *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 662 F. Supp.

5   71, 75 (E.D. Mich.1987)).   The court focused on the "substance of the damage claim." *Id.* at

6   884.   Because "the substance of the claim for response costs" concerned "compensation for

7   restoration of contaminated water and real property," it was a claim for "property damage"

8   within the policy's scope. *Id.* at 884–85.

9       Here, in contrast, the "substance of the claim" in the underlying complaints is that AMS

10   committed fraud and other intentionally wrongful practices.   Curiously, AMS asserts that the

11   "only expressed motivation for filing the Underlying Lawsuits was to 'address concerns for

12   resident safety.'" Dkt. No. 59 at 3.   This contention is directly contradicted by the underlying

13   complaints. *See* Dkt. No. 51-1 at 2 (Fort Benning action brought "to seek declaratory judgments

14   that the Property Management Agreements . . . are terminated for cause"); Dkt. No. 51-6 at 2

15   (MBMH "complaint seeks declaratory and injunctive relief to prevent Defendants from . . .

16   taking steps to unilaterally amend two property management agreements to effectively immunize

17   Defendants from liability for their own fraud").

18       AMS cites the GAO report regarding litigation costs.   Dkt. No. 59 at 3.   But at the cited

19   page, the report explains that "Clark asked the Army for permission to remove Pinnacle as

20   property manager at Fort Benning and Fort Belvoir because of alleged willful misconduct by

21   Pinnacle employees . . . ." Dkt. No. 67-2 at 8.[5]   It then describes AMS's attempt "to unilaterally

22   amend the terms" of the property management agreements and states that the MBMH plaintiffs

23   brought suit "seeking a declaratory judgment that the agreements had not been effectively

24   amended by Pinnacle."[6]   *Id.*   The Army wanted AMS removed "due to the alleged fraud and

---

[5] As explained above, this document is irrelevant because it was not previously called to Scottsdale's attention.

[6] AMS is referred to interchangeably as both "AMS" and "Pinnacle" in the underlying litigation.

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 6
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

mismanagement." *Id.*  Only after explaining this dispute, does the report say that "additionally" Army officials were "motivated by concerns for resident safety." *Id.*  In short, the substance of the underlying litigation was a commercial dispute, based on intentional misconduct, for which insurance coverage would violate this state's public policy. *See Am. Home Assur. Co. v. Cohen,* 124 Wn.2d 865, 871, 881 P.2d 1001 (1994).

### C.   AMS fails to show that the underlying complaints sought liability for property damage or bodily injury.

The Scottsdale policies provided coverage only for "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Dkt. Nos. 50-6 at 21, 50-8 at 22, 50-9 at 21, 50-10 at 24.  The duty to defend accrued only with respect to suits "seeking those damages." *Id.*  AMS cannot show that the underlying cases were suits seeking damages for property damage or bodily injury.

#### 1.   Creation of a risk is not property damage or bodily injury.

AMS attempts to shoehorn the underlying litigation into this coverage by referring to the allegation that work-order fraud led to "critical life and safety" hazards. Dkt. No. 59 at 7.  AMS contends that courts "in other jurisdictions hold that allegations of exposure to health and safety risks can be sufficient to allege the possibility of covered 'bodily injury.'" *Id.* at 16 (citing *U.S. Fid. & Guar. Co. v. Korman Corp.,* 693 F. Supp. 253, 259 (E.D. Pa. 1988)).  Despite claiming that "other jurisdictions" so hold, AMS relies entirely on a single case from Pennsylvania.

In *Korman,* the language about "health and safety risks" was dicta. *See Korman,* 693 F. Supp. at 259.  The court mentioned that the Pennsylvania Superior Court had "determined in dictum" that similar allegations of exposure to health and safety risks alleged "bodily injury." *Id.* (citing *Techalloy Co. v. Reliance Insurance Co.,* 338 Pa.Super. 1, 487 A.2d 820 (1984)).  The court declined to decide the issue, however, because any arguable bodily injury or property damage would be excluded on other grounds. *Id.* at 259.  It is telling that, for its linchpin legal proposition, AMS relies on dicta from a 27-year-old Pennsylvania case that relied, in turn, on

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 7
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

1   dicta from a Superior Court case.  Moreover, unlike the underlying plaintiffs here, the *Korman*

2   plaintiffs specifically alleged not only that the defendants created risks but also that these risks

3   caused damage.  *See id.* (noting that the plaintiffs sought "damages for their properties' loss in

4   value," as well as "damages 'for costs of medical monitoring made necessary by their exposure

5   to the health and safety risks concealed by defendants' and for emotional distress").

6          Indeed, AMS's argument—that allegations of created risk trigger insurance coverage—

7   conflicts with Washington law.  *See Wellbrock v. Assurance Co. of Am.*, 90 Wn. App. 234,

8   242-43, 951 P.2d 367 (1998).  In *Wellbrock*, a developer negligently damaged trees on property

9   adjacent to the plaintiffs' residence.  The following year, one of the trees fell onto the plaintiffs.

10  *Id.* at 237.  The developer's insurance policy expired between the time the trees were damaged

11  and the day the injurious tree fell.  *Id.* at 243.

12         The court explained that coverage is not triggered until an actual injury occurs:

> We therefore hold that the coverage triggering "occurrence" refers
> to ***the event causing injury to the complaining party, not the
> earlier event that created potential for future injury.***  An
> "occurrence" refers to "***the fruits of a negligent act, not to the
> sowing of the seeds***" because it is the consequence that signifies
> coverage, and not the cause.  *Stillwell v. Brock Bros., Inc.,* 736
> F.Supp. 201, 206 (1990).  ***The mere presence of a "hazard,"***
> defined as a "source from which an accident may arise," 11 Couch,
> § 44:286, ***does not trigger coverage.***  *Stillwell*, 736 F.Supp. at 206.

18  *Wellbrock*, 90 Wn. App. at 242-43 (emphasis added).  Because the creation of a hazard failed to

19  trigger coverage, the insurer had no duty to defend.  *Id.* at 244.  The same is true here.

20         2.      The underlying plaintiffs lacked standing to claim bodily injury.

21         In any event, there can be no rational contention that the underlying plaintiffs sought

22  damages for bodily injury.  Under the policies, "bodily injury" is "bodily injury, sickness or

23  disease sustained by a person, including death resulting from any of these at any time."  Dkt.

24  Nos. 50-6 at 33, 50-8 at 34, 50-9 at 81, 50-10 at 88.  The underlying plaintiffs were limited

25  liability companies, incapable of sustaining such injury.  *See* Dkt. Nos. 51-5 at 1, 51-10 at 1.

26

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 8
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

1    AMS attempts to distract from this most obvious of points by claiming that its conduct

2    may have harmed other people. *See, e.g.*, Dkt. No. 59 at 8.  In particular, AMS relies on Paul

3    Cramer's declaration, in which he described two incidents, one in which a family was exposed to

4    carbon-monoxide fumes and another in which a fire caused a fatality.  *Id.* at 9.  AMS also

5    mentions two cases filed against AMS in Monterey County Superior Court in California,

6    designated as the *Mosquera* and *Charbonneau* cases. *Id.* at 11.

7    But neither the *Charbonneau* and *Mosquera* plaintiffs nor the two individuals mentioned

8    by Cramer were parties to the underlying litigation, and the underlying plaintiffs did not have

9    standing to sue for these other individuals' injuries.  The MBMH complaint does *not* allege, for

10   example, that Clark Pinnacle Monterey Bay LLC ("CPMB")[7] incurred liability to the Mosqueras

11   or the Charbonneaus and sought contribution from AMS.  Nor do the underlying complaints

12   allege that the underlying plaintiffs took assignment of any individuals' claims.

13   Absent such an allegation, a California or Georgia court could not have found AMS

14   liable to the underlying plaintiffs for bodily injury sustained by non-parties.  *See Feminist*

15   *Women's Health Ctr. v. Burgess*, 282 Ga. 433, 434-35, 651 S.E.2d 36 (2007) (to establish

16   standing, a litigant must have suffered an "injury in fact") (citing *Powers v. Ohio*, 499 U.S. 400,

17   411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)); *Emerald Bay Cmty. Ass'n v. Golden Eagle Ins.*

18   *Corp.*, 130 Cal.App.4th 1078, 1091–92, 31 Cal.Rptr.3d 43 (2005) (trial court correctly dismissed

19   uninjured party's lawsuit based on lack of standing where complaint did not allege assignment or

20   claim contribution).  As such, AMS faced no potential liability for bodily injury.

21   3.    AMS fails to show any potential liability for property damage.

22   Nor did the underlying complaints seek liability for property damage.  "Property

23   damage" means: (a) "Physical injury to tangible property, including all resulting loss of use of

24   that property"; or (b) "Loss of use of tangible property that is not physically injured." Dkt. Nos.

25   _____

26   [7] CPMB is the only underlying plaintiff that was also a defendant in either the *Mosquera* or the *Charbonneau* case.  *See* Dkt. No. 66 at 1, 41–42.  No plaintiff in the Fort Benning action was sued in either of these cases.

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 9
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

50-6 at 35, 50-8 at 36, 50-9 at 35, 50-10 at 38.  There are no allegations in the underlying complaints that would meet either definition.[8]  AMS acknowledges that there is "no need to resort to extrinsic evidence." *Id.* at 16.  But it then dedicates most of its brief to extrinsic evidence, including declarations and other pleadings from the underlying litigation, all of which fail to show potential liability for property damage.

**The employee declarations failed to allege any instances of property damage.**  AMS argues that the underlying complaints' references to "'life and safety' issues" were "a proxy for property damage and bodily injury."  Dkt. No. 59 at 5.  AMS then claims that ex-employee declarations "unambiguously recount multiple alleged instances of property damage." *Id.* (citing Dkt. Nos. 52-4 at 30–36; 52-5; 52-6; 52-7 at 1–2; Mathews decl., Exs. 17-26).  The cited documents, however, reveal that the underlying plaintiffs—far from using "risks" as a "proxy" for anything—meant exactly what they said in their detailed, 62-page complaint.  Rather than recounting "instances of property damage," these documents support only the notion that AMS's misconduct may have created unspecified "risks."

AMS cites, for example, ex-employee declarations at Dkt. Nos. 52-5–52-7.  These offer a few references to pre-existing damage, with no suggestion that AMS caused it.  *See* Dkt. No. 52-6 at 4 ("there was a spreadsheet kept of open work orders related to cracked countertops and flooded basements"); *id.* at 31 (employee instructed "to close out some work orders relating to cracked countertops and to melted siding, even though the work had not been completed").

Other declarations speculated that failure to make repairs *might* cause conditions to worsen in the future, with no allegation that this actually occurred.  *See id.* at 13 ("I was concerned for residents that if we had not inspected and repaired the damage, they could later

---

[8] AMS might argue that one allegation in the Fort Benning action, that AMS stole scrap metal, could meet definition (b).  Although Washington law is silent on this issue, other jurisdictions have rejected the notion that conversion meets this definition of property damage, because conversion damages are loss of the property itself, not loss of its use.  *See, e.g., Collin v. Am. Empire Ins. Co.*, 21 Cal.App.4th 787, 817–19, 26 Cal.Rptr.2d 391 (1994).  It is not necessary for the Court to resolve this issue here, however, because theft is not an accidental occurrence and is subject to various exclusions, as discussed below.

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 10
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

1  have mold issues."); *id.* at 29 ("… I knew that there would be no record in the system showing

2  that the maintenance work had not been done, even if that work was critical to the safety of the

3  home and its residents."); Dkt. No. 52-7 at 2 (employee was told to paint over mold and "knew

4  this was wrong because it meant that mold wasn't being removed properly").

5  　　AMS also cites several exhibits to the Mathews declaration.   These are additional

6  declarations which, as explained above, were not previously submitted to Scottsdale and

7  therefore are irrelevant.  *See* Dkt. Nos. 66-1, 66-2.  They also fail to allege any instances of

8  property damage.  They focus instead on allegations that AMS employees accepted bribes and

9  kickbacks.  *See, e.g.*, Dkt. No. Dkt. No. 66-1 at 1–2 (claiming an AMS employee took bribes in

10  exchange for sending mold-remediation work to a company that was not certified to do it); *id.* at

11  4 (AMS employee told subcontractor he needed a "5 finger discount"); *id.* at 18 ("there was

12  something wrong in terms of how vendors were being chosen and why certain vendors were kept

13  on even when they did not do good work or when other vendors would bid less").

14  　　There are also claims that AMS failed to handle mold properly, but no claim that this

15  caused damage.  *See* Dkt. No. 66-1 at 3 ("residents would call to complain about mold issues,

16  and no work order would even be entered in the system"); *id.* at 13 (technicians told to paint over

17  mold); *id.* at 16 (employee instructed to cover up serious mold issues); *id.* at 22 (employee

18  worried that mold was a health risk to him); *id.* at 30 (technicians were instructed to tell residents

19  that there was no mold at Fort Irwin because the climate was too dry).  And, again, there is

20  speculation that AMS's practices could cause harm, but no assertion that they did.  *See* Dkt. No.

21  66-2 at 2 (employee refused to "close open work orders because that would hurt the residents").

22  　　**The Cramer declaration likewise fails to show any claim for property damage.**  AMS

23  points to Mr. Cramer's statements about resident safety.  *See* Dkt. No. 59 at 8–9.  Scottsdale

24  explained this declaration's failings in its cross motion for summary judgment.  Dkt. No. 53 at

25  20.  Notably, the judge in the underlying case saw it the same way.  *See* Bridgman decl.,[9] Ex. A.

26  
---
[9] The Bridgman Declaration in opposition to AMS's motion is filed together with this response.

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 11
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

1    In the underlying litigation, AMS obtained a preliminary injunction prohibiting the

2    underlying plaintiffs from removing American Management Services California Inc. ("AMSC")

3    as manager of the California projects. *Id.* at 1. In denying the underlying plaintiffs' request to

4    dissolve the preliminary injunction before trial, Judge Freeman noted that the Cramer declaration

5    "identifies two specific incidents involving resident safety but indicates that the declarant is '*not*

6    suggesting that these incidents were the direct result of conduct by Pinnacle,' only that they

7    'illustrate the significance of responding to work orders' and the Army's ability to trust the work

8    orders." *Id.* at 21. There was "no evidence before the Court that resident safety at the Monterey

9    and Irwin projects has been impacted by AMSC." *Id.* The declaration did *not* even establish that

10   the two resident-safety incidents "were caused by AMSC's alleged work order fraud." *Id.* at 22.

11   The court thus could *not* "conclude that a risk to resident safety is a likely (as opposed to

12   speculative) consequence of continuing the injunction against AMSC's removal . . . ." *Id.*

13   **AMS's motion in limine likewise fails to show that the underlying plaintiffs sought**

14   **damages based on threats to resident safety.** AMS used Judge Freeman's preliminary-

15   injunction ruling as the basis for the motion in limine that it now claims should have put

16   Scottsdale on notice that property damage was at issue. *See* Dkt. No. 59 at 10. On June 25, 2015

17   (three days after filing its complaint here), AMS moved to exclude "any reference to the

18   unfounded proposition that resident lives were ever put in danger as a result of alleged work

19   order changes or any other conduct by Defendants." Dkt. No. 65 at 3. AMS argued that the

20   underlying plaintiffs offered this evidence "to engender emotional sympathy for their claims."

21   *Id.* Citing the court's earlier ruling, AMS asserted that there was no evidence to support the

22   claims of resident danger and that the claims of such dangers were irrelevant. *Id.*

23   At the outset, AMS fails to explain how, if it believed the underlying litigation sought

24   damages for the creation of life-safety hazards when it filed its complaint in this action on June

25   22, 2015, it could have argued on June 25, 2015 that such hazards were irrelevant in the

26   underlying litigation. Moreover, if the underlying plaintiffs indeed sought such damages, then

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 12
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

their response would have been something to the effect of: "this information is relevant because it is a basis for our damages claim." But they said nothing of the sort.

Instead, they argued that there is "no doubt that closing a work order when the work was not done has the *potential* to create a serious life safety risk for residents." Dkt. No. 65 at 8 (emphasis added). It was "important to allow the jury to understand the *potential consequences* of the fraudulent closing of open work orders as Pinnacle did before the work was completed. . . . Put another way, when someone engages in a fraudulent scheme, at trial they don't get to exclude evidence of the *potential consequences* of their fraud." *Id.* at 10 (emphasis added).

In short, the motion in limine merely confirms: (1) that the underlying plaintiffs did not seek damages for the hazards that AMS's fraud allegedly created; and (2) that the underlying plaintiffs could not identify any instance of such harm and instead claimed only "potential" harm. Because, as explained above, the mere creation of a risk is not "property damage," *a fortiori* the *potential* creation of a risk is certainly not "property damage" as a matter of law.

## D.   AMS fails to show an alleged accidental occurrence.

AMS's claims fail for the additional and independent reason that the underlying complaints did not allege a covered "occurrence." Under the Scottsdale policies, an "occurrence" is "an *accident*, including continuous or repeated exposure to substantially the same general harmful conditions." Dkt. Nos. 50-6 at 34, 50-8 at 35, 50-9 at 34, 50-10 at 37 (emphasis added). On their face, the underlying complaints did not allege any "accidents." What they alleged was, in AMS's own words, "a pattern of misconduct." Dkt. No. 59 at 6.

### 1.   AMS bears the burden of proving that both the alleged conduct and the alleged result were unintended.

AMS attempts to maneuver the unambiguous allegations of intentional wrongdoing into the accident realm by arguing that, although the underlying complaints alleged intentional wrongdoing, they do not allege that AMS intended to inflict property damage or bodily injury.

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 13
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

1    Therefore, in AMS's view, the damages should be considered accidental. This argument

2    contravenes well-established Washington law.

3            In particular, AMS misstates Washington law when it argues that the insurers "must

4    prove, as a matter of law, that the AMS Insureds intended the resultant property damage and

5    bodily injury at issue in the Underlying Lawsuits . . . ." Dkt. No. 59 at 17. For this proposition,

6    AMS relies on *Queen City Farms, Inc. v. Cent. Nat. Ins. Co. of Omaha*, 126 Wn.2d 50, 59–60,

7    882 P.2d 703 (1994). *Queen City* does not support AMS's arguments, for three reasons.

8            **First, AMS is incorrect when it claims that it is Scottsdale's burden to prove the**

9    **intentional nature of AMS's misconduct.** The insured bears the burden of proving that a loss

10   is within the policy's coverage. *Overton v. Consol. Ins. Co.*, 145 Wn.2d 417, 431, 38 P.3d 322

11   (2002) (citing *McDonald v. State Farm Fire & Cas. Co.,* 119 Wash.2d 724, 731, 837 P.2d 1000

12   (1992)). Only then does the burden shift to the insurer to show that an exclusion applies. *Id.*

13   Indeed, *Queen City* placed the burden of proof on the insured. *See Queen City*, 126 Wn.2d at 72.

14   AMS thus bears the burden of proving that the underlying actions alleged an "occurrence,"

15   including that its misconduct was an "accident." *See, e.g.*, Dkt. No. 50-6 at 21, 34.

16           **Second, in *Queen City* "occurrence" was defined differently than it is here.** Again,

17   the Scottsdale policies define "occurrence" as "an accident, including continuous or repeated

18   exposure to substantially the same general harmful conditions." Dkt. Nos. 50-6 at 34, 50-8 at 35,

19   50-9 at 34, 50-10 at 37. The definition of "occurrence" at issue in *Queen City*, however, was "an

20   accident or happening or event or a continuous or repeated exposure to conditions which

21   *unexpectedly and unintentionally* results in personal injury, property damage." *Queen City*, 126

22   Wn.2d at 59–60 (emphasis added). Thus, the *Queen City* policies contained a caveat that is not

23   present in the Scottsdale policies: that the resulting injury be unexpected and unintentional.

24           The distinction is crucial because the portion of *Queen City* on which AMS relies focuses

25   on the words "unexpectedly and unintentionally." *Id.* at 67–68. The court distinguished this

26   analysis from cases construing the meaning of the term "accident." *Id.* The court explained that

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 14
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

1  "determination of what constitutes an accident, *i.e.*, whether injury or damage has resulted from

2  an 'accident,' is not dispositive on the standard for expectation of the damages." *Id.* at 68.

3      In contrast, Washington courts have repeatedly held that the question of whether an event

4  was an "accident" is an objective inquiry.   The Washington Supreme Court has stated in no

5  uncertain terms that "'accident' is not a subjective term.  Thus, the perspective of the insured as

6  opposed to the tortfeasor is not a relevant inquiry.  Either an incident is an accident or it is not."

7  *Safeco Ins. Co. of America v. Butler*, 118 Wn.2d 383, 403, 823 P.2d 499 (1992) (quoting *Roller*

8  *v. Stonewall Ins. Co.*, 115 Wn.2d 679, 685, 801 P.2d 207 (1990)); *accord. United Servs. Auto.*

9  *Ass'n v. Speed*, 179 Wn. App. 184, 198, 317 P.3d 532 *review denied*, 180 Wn. 2d 1015, 327 P.3d

10  55 (2014) ("Whether an event constitutes an accident is determined objectively and does not

11  depend on the insured's subjective perspective.") (citing *Roller*, 115 Wn.2d at 685).

12      **Finally, AMS is mistaken when it argues that showing unintended consequences is**

13  **sufficient to establish an accident.**   To the contrary, AMS bears the burden of proving *both* that

14  the result was unintended and that the means were accidental:

15  > The rule is now firmly established in this state that, in order to
16  > recover under a policy insuring against death or injury by
   > accidental means, (1) it is not enough that the *result* was unusual,
   > unexpected or unforeseen, but it must appear that the *means* were
17  > accidental; and (2) accident is never present when a deliberate act
   > is performed, unless some additional, unexpected, independent,
18  > and unforeseen happening occurs which produces or brings about
   > the result of injury or death.
19
   *Johnson v. Bus. Men's Assur. Co. of Am.*, 38 Wn.2d 245, 249, 228 P.2d 760 (1951) (citing *Evans*
20
   *v. Metropolitan Life Insurance Co.*, 26 Wn.2d 594, 174 P.2d 961 (1946)).
21  > ***It is not necessary that the claimant intend or expect the***
   > ***injurious consequences of her actions.***  Unigard [*Mut. Ins. Co. v.*
22  > *Spokane Sch. Dist. 81*, 20 Wn. App. 261,] 263, 579 P.2d 1015
   > [(1978)]) (fire in school garbage can resulting in building blaze);
23  > *Safeco Ins. Co. v. Dotts*, 38 Wash.App. 382, 385–86, 685 P.2d 632
   > (1984) (backhand slap resulting in death).  All that is required is
24  > that the claimant know or should know facts from which a prudent
   > person would conclude that the injurious consequences are
25  > reasonably foreseeable.  *Unigard*.  ***Otherwise, an insured could***
   > ***shift intentionally inflicted injuries to an insurer in violation of***
26

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 15
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

1    *public policy.* *Detweiler[ v. J.C. Penney Casualty Ins. Co.*, 110
2    Wn.2d 99,] 105–06, 751 P.2d 282 [(1988)]; *Unigard,* at 265, 579
    P.2d 1015; *Dotts,* at 386, 685 P.2d 632.

3 *Lloyd v. First Farwest,* 54 Wn. App. 299, 302–03, 773 P.2d 426 (1989) (emphasis added).

4    Washington courts routinely deny coverage where the insured's intentional misconduct

5 had unintended consequences. *See, e.g., Safeco Ins. Co. of America v. Butler*, 118 Wn.2d 383,

6 386–87, 823 P.2d 499 (1992) (no covered accident where insured fired gun at truck, not

7 intending to hit occupants, but ricochet struck an occupant); *Williams v. Life Ins. Co. of N. Am.*,

8 No. C14-0866 RSM, 2015 WL 4604100, at *6 (W.D. Wash. July 30, 2015) (insured's own death

9 not a covered accident where he deliberately rode his motorcycle while intoxicated).

10    There are two types of cases in which Washington courts have recognized that intentional

11 conduct can be considered an accident for purposes of liability insurance.  The first occurs where

12 the intentional conduct was not intended to be wrongful.  The courts have sometimes described

13 this as the difference between "intentional" and "deliberate" acts.  *See Nationwide Mut. Ins. Co.*

14 *v. Hayles, Inc.*, 136 Wn. App. 531, 538, 150 P.3d 589 (2007).   A deliberate act is "done with

15 awareness of the implications or consequences of the act." *Id.*

16    *Hayles* illustrates this distinction.  There, the insured turned on an onion field's irrigation

17 system, not realizing that he was overwatering the crops and causing them to rot.  *Hayles*, 136

18 Wn. App. at 535.   The court held that insurance coverage applied only upon a finding that

19 reasonable minds "could only conclude that no one under these circumstances would have

20 anticipated that turning on the water could rot the onions." *Id.* at 539.   The conduct therefore

21 "although intentional was not deliberate." *Id.* at 539.

22    The second occurs where the conduct is intended to be wrongful (i.e. "deliberate"), but

23 "some additional, unexpected, independent, and unforeseen happening occurs which produces or

24 brings about the result of injury or death." *Butler*, 118 Wn.2d at 401 (quoting *Detweiler*, 110

25 Wn.2d at 104).   An example of such a case appears in *State Farm Fire & Cas. Co. v. Ham &*

26 *Rye, L.L.C.*, 142 Wn. App. 6, 17, 174 P.3d 1175 (2007).  There, the insured burned some papers

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 16
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

1  in a dumpster and on the sidewalk. *Id.* at 8. She watched the fire burn out and then stomped on

2  it and patted it with a sweatshirt to extinguish it. *Id.* at 9. After she left the scene, the fire spread

3  to a nearby building. *Id.* The court held that the claim could be covered if a jury decided that the

4  damage to the building was not "reasonably foreseeable." *Id.* at 17.

5         Here, AMS offers no evidence from which a similar result could be reached. The

6  complaint plainly alleges a fraudulent scheme, not a seemingly innocent act like the watering of

7  crops in *Hayles*. And this case is nothing like *Ham & Rye*, where the insured committed a

8  one-time wrongful act and carefully monitored it until she believed she had eliminated any

9  hazard. Indeed, the allegations here are the opposite: that AMS's ***ongoing*** fraudulent conduct

10  made it impossible to monitor existing hazards. *See* Dkt. No. 51-10 at 2–3, 21.

11        The allegations are that AMS stole scrap metal and falsified work orders so that people

12  would think repairs had been done when they had not. Undoubtedly, it is reasonably foreseeable

13  that a person from whom personal property is stolen will be deprived of it. Likewise, it is sheer

14  common sense that: (a) if repairs to life-safety equipment like fire alarms and carbon-monoxide

15  detectors are not performed, the property and the residents will be at risk of fire damage or

16  carbon-monoxide poisoning; and (b) if the person charged with repairing the equipment

17  fraudulently misrepresents that it has been repaired, the risk will abide. A prudent person would

18  have concluded that the supposed property damage posited by AMS was a reasonably

19  foreseeable result of AMS's intentional misconduct. *See Lloyd*, 54 Wn. App. at 302–03. AMS

20  thus cannot bear its burden of proving that this misconduct was accidental.

21              2.    The underlying plaintiffs alleged only intentional breaches of
                      fiduciary duty.
22
           AMS offers an alternative argument based on the notion that one of the underlying causes
23
   of action, breach of fiduciary duty, can in theory be accomplished negligently. This argument
24
   fails as a matter of law. An automobile collision may occur either negligently or intentionally.
25
   If it is done intentionally, it is not a covered accident. *See, e.g., Roller*, 115 Wn.2d at 685–86,
26

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 17
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

1   *overruled on other grounds by Butzberger v. Foster*, 151 Wn.2d 396, 89 P.3d 689 (2004).   The

2   courts differentiate between negligent and intentional collisions by examining the substance of

3   the claim.   *See id.* (no underinsured motorist coverage where uninsured motorist deliberately

4   rammed her car into plaintiff); *see also Roberts*, 179 Wn. App. at 765 (no duty to defend, even if

5   tort could be committed negligently, where plaintiff did not allege accident and alleged that harm

6   resulted from "fraud, undue influence, and tortious interference").

7          The underlying plaintiffs' allegations here do not support AMS's contention that they

8   could have resulted in liability for negligent conduct.   The MBMH action, for example, alleged

9   that AMS and its affiliates breached their fiduciary duties in the following intentional ways:

10         • "committing wide-spread work order *fraud*";

11         • "instructing their employees and agents to commit *fraud and other
             intentional misconduct*";

12
13         • "*misappropriating* MBMH's assets";

           • *conspiring* to inflate the plaintiffs' insurance costs;
14
15         • "failing to disclose to MBMH and CMC that they had committed
             *fraud and other intentional misconduct*";

16         • causing the plaintiffs to overfund the insurance aggregate and then
             *keeping the excess funds*; and
17
18         • causing AMSC "to engage in *fraud, theft and intentional and
             knowing misconduct*."

19
    Dkt. No. 51-10 at 45–46 (emphasis added).
20
21         The Fort Benning claims are substantially similar.   *See* Dkt. No. 51-5 at 64–68.   They

22   allege the same insurance scheme and assert that AMS committed fraud and self dealing and

23   covered up its employees' fraudulent actions, including bribery and kickbacks.   *Id.* at 65–67.

24   Contrary to AMS's assertion, Scottsdale did not "unilaterally" characterize the underlying

25   litigation as involving strictly intentional conduct. Dkt. No. 59 at 19.   Rather, the underlying

26

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 18
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

1    plaintiffs characterized their claims as such, and Scottsdale correctly denied coverage based on

2    the eight corners of the policies and the complaints. *See Expedia*, 180 Wn.2d at 803.

3    **E.**     **AMS's claims for a defense are barred by policy exclusions.**

4    The lack of any covered claim ends the Court's inquiry and makes it unnecessary to

5    consider exclusions. In the interest of completeness, however, Scottsdale analyzes here three

6    exclusions that would preclude any duty to defend, even if the underlying plaintiffs had alleged a

7    covered claim. Specifically, the exclusions for bacteria or fungi, for expected or intended injury,

8    and for costs to prevent property damage all would bar coverage.

9    1.     Any mold-related claims are excluded.

10    Some of the declarations provided in AMS's extrinsic evidence make vague references to

11    AMS's practice of not properly remediating mold. Again, none of these declarations identify

12    any specific instance in which this practice caused any actual damage. However, if

13    hypothetically the underlying plaintiffs had raised such an allegation, insurance coverage would

14    be barred by the Fungi or Bacteria Exclusion, which prohibits coverage for:

15           a. "Bodily injury" or "property damage" which would not have

16           occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to,

17           existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether

18           any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

19           b. Any loss, costs or expenses arising out of the abating, testing

20           for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any

21           way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

22    Dkt. Nos. 50-6 at 46; 50-8 at 49; 50-9 at 49; 50-10 at 53. "Fungi" are "any type or form of

23    fungus, including *mold* or mildew and any mycotoxins, spores, scents or byproducts produced or

24    released by fungi." *Id.* (emphasis added). As such, AMS cannot claim a defense based on its

25

26

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 19
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

1  employees' failure to remediate mold. *See Wright v. Safeco Ins. Co. of Am.*, 124 Wn. App. 263,

2  274–76, 109 P.3d 1 (2004) (enforcing mold exclusion).

3          2.    <u>The policies bar coverage for expected or intended injury.</u>

4      As Scottsdale explained in its cross motion for summary judgment (Dkt. No. 53 at

5  21-22), its policies contained an exclusion for damage that is "expected or intended from the

6  standpoint of the insured." Dkt. Nos. 50-6 at 22; 50-8 at 23; 50-9 at 22; 50-10 at 25.  In its

7  motion, AMS conflates the analysis of whether there has been a covered "accident" with the

8  separate analysis of whether damage was "expected or intended." *See* Dkt. No. 59 at 14–15.

9      The appropriate analysis is outlined in *Rodriguez v. Williams*, 107 Wn.2d 381, 384, 729

10  P.2d 627 (1986).  There, a teenager sued her stepfather for incest and then sued to establish

11  coverage under his homeowner's insurance policy. *Id.* at 382.  The policy coverage was not

12  limited to accidental occurrences, but rather covered broadly "damages because of personal

13  injury." *Id.* But it excluded damage "which is expected or intended by the insured." *Id.*

14      The Washington Supreme Court distinguished this from a typical liability policy "in

15  which coverage for personal injuries only applies to 'accidental occurrences.'" *Id.* at 384.  The

16  distinction was important because if an "accidental occurrence" policy had been at issue, it

17  "*would simply deny that coverage existed* under the policy because the act of committing incest

18  could not be described as an accidental occurrence." *Id.* (emphasis added).  It was only because

19  the coverage grant was not limited to accidents that the court found it necessary to analyze the

20  "expected or intended" exclusion. *Id.*  The court concluded that given the obviously harmful

21  nature of the alleged conduct, intent to injure would be imputed to the insured, and the intended-

22  injury exclusion therefore applied. *Id.* at 387.

23      Here, the analysis is similar, except that the policies limit coverage to accidental

24  occurrences.  As such, it is not necessary to analyze the exclusion.  The Court should "simply

25  deny that coverage existed under the policy because the act of committing [theft, fraud, and other

26  intentional misconduct] could not be described as an accidental occurrence." *Id.* at 384.

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 20
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

1  However, if the Court considers the exclusions, intent to injure—or at least an expectation of

2  injury—should be imputed to AMS because its intentional misconduct was obviously harmful.

3              3.     The owned-property exclusion applies.

4         As Scottsdale explained in its cross motion, the owned-property exclusion would bar

5  coverage if any claim for property damage had been made in the underlying litigation. *See* Dkt.

6  No. 53 at 22–24. This exclusion precludes coverage for damage to property "you own, rent, or

7  occupy." *Id.* at 22. The underlying plaintiffs either owned or rented the subject property and

8  qualified as "you" under the policies, both because they were AMS's affiliates and because AMS

9  was responsible for procuring insurance for them, thereby triggering the exclusion. *Id.* at 22–24.

10 Moreover, any coverage for stolen scrap metal would be excluded because it involves personal

11 property in AMS's "care, custody or control." *Id.* at 24.

12        Notably, the policies expressly exclude the type of damage that AMS theorizes could

13 have been alleged in the underlying litigation. To the extent the underlying plaintiffs could have

14 claimed costs for remedying hazardous conditions, the policy excludes "any costs or expenses

15 incurred *by you, or any other person, organization or entity,* for repair, replacement,

16 enhancement, restoration or maintenance of such property for any reason, including *prevention*

17 *of injury to a person or damage to another's property.*" Dkt. Nos. 50-6 at 24; 50-8 at 25; 50-9 at

18 24; 50-10 at 27 (emphasis added). AMS's claims thus fail for this reason as well.

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 21
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

### III.   CONCLUSION

The underlying litigation did not allege property damage, bodily injury, or an accidental occurrence and thus was not covered under Scottsdale's policies, and was also subject to exclusions.  As such, Scottsdale — and not AMS — is entitled to judgment as a matter of law.

DATED this 11th day of December, 2015.

OGDEN MURPHY WALLACE, P.L.L.C.

By     s/Geoff J. M. Bridgman
       Geoff J. M. Bridgman, WSBA #25242
       Tracy N. Grant, WSBA #40877
       901 Fifth Avenue, Suite 3500
       Seattle, Washington 98164-2008
       Tel: 206.447.7000/Fax: 206.447.0215
       Attorneys for Defendant
       Scottsdale Insurance Company

SELMAN BREITMAN, LLP

By s/Peter Mintzer
       Peter Mintzer, WSBA #19995
       800 Fifth Avenue, Suite 4100
       Seattle, Washington 98104
       Tel: 206.447.6461/Fax: 206.588.4185
       Email: pmintzer@selmanlaw.com
       Attorneys for Scottsdale Insurance Company

{APR1389662.DOCX;8/00335.002030/ }
DEFENDANT SCOTTSDALE INSURANCE COMPANY'S OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT - 22
NO. C15-Civil-01004

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

1

## CERTIFICATE OF SERVICE

2

    I certify under the laws of the United States of America that on the 11th day of December,

3  2015, I electronically filed a true and correct copy of the foregoing document with the Clerk of

   the Court using the CM/ECF System and served counsel below by the method indicated:

4

5  | Dwain Clifford, pro hac vice | [ ] U.S. Mail |
   | Kevin Mapes, WSBA #40416 | [ ] Messenger |
6  | Nicholas Thede, pro hac vice | [ ] Email |
   | Kyle A. Sturm, pro hac vice | [ X ] CM/ECF |
7  | James Clark Prichard, WSBA #30077 | |
   | Ball Janik LLP | |
8  | 101 SW Main Street, Suite 1100 | |
   | Portland, OR 97204 | |
9  | **Attorneys for Insureds** | |

10

11 | Linda L. Foreman, WSBA #11817 | [ ] U.S. Mail |
   | Bowers Foreman, PLLC | [ ] Messenger |
12 | 5825 60th St. SE | [ ] Email |
   | Snohomish, WA 98290 | [ X ] CM/ECF |
13 | **Attorneys for Insureds** | |

14 | Stephen Skinner, WSBA #17317 | [ ] U.S. Mail |
   | Andrews Skinner, P.S. | [ ] Messenger |
15 | 645 Elliott Avenue W. Ste 350 | [ ] Email |
   | Seattle, WA 98119 | [ X ] CM/ECF |
16 | **Attorneys for Lexington** | |

17

18 DATED this 11th day of December, 2015.

19

20                                        s/Geoff Bridgman, WSBA#25242
                                          Geoff Bridgman

21

22

23

24

25

26