UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AMERICAN MANAGEMENT
SERVICES EAST LLC, et al.,

                Plaintiffs,

        v.                                          C15-1004-TSZ

SCOTTSDALE INSURANCE                                ORDER
COMPANY, et al.,

                Defendants.

THIS MATTER comes before the Court on the parties' cross-motions for summary judgment on the issue of the defendant insurers' duty to defend plaintiffs in two underlying suits.  *See* docket nos. 53, 57, & 59.[1]  Having reviewed all papers filed in support of, and in opposition to, the parties' motions, the Court enters the following order.

*Background*

**A.        Introduction**

        Plaintiffs, comprised of a number of management companies and two of their CEOs,[2] collectively operate military housing projects for the U.S. Army located in

_____

[1] Plaintiffs filed a praecipe to attach a different version of their motion for summary judgment.  *See* docket no. 70.  The Court DENIES the motion to strike, as the praecipe does not materially alter the arguments nor prejudice defendants.

[2] Plaintiffs are comprised of American Management Services East, LLC, American Management Services LLC, American Management Services California Inc., Goodman

1    Georgia, Virginia, and California.  At issue in this case are two suits brought against

2    plaintiffs in Georgia state court and California federal court alleging fraudulent

3    mismanagement of certain housing projects.[3]  Defendant Lexington provided plaintiffs

4    with general commercial liability coverage from April 2003 until April 2008, and

5    defendant Scottsdale thereafter provided the same coverage until April 2012.  These

6    insurance policies obligated the insurers to pay "those sums that the insured becomes

7    legally obligated to pay as damages because of 'bodily injury' or 'property damage'" so

8    long as such damages resulted from an "occurrence," as defined in the policies.

9    Stipulated Exhibits ("Stip. Exs."), docket no. 50, Ex. 6 (2008 Scottsdale Policy at 21).[4]

10          Plaintiffs brought this action seeking a declaratory judgment that defendants had

11   an obligation to defend them in the underlying suits.  Plaintiffs also allege

12   extracontractual claims for (i) insurance bad faith; (ii) violation of the Insurance Fair

13   Conduct Act, RCW 48.30.015; and (iii) violation of the Washington Consumer Protection

14   Act, RCW 19.86 *et seq.*  The duty to defend is the sole issue before the Court on these

15   motions.

---

19   Real Estate, Inc., Stanley Harrelson, John Goodman, Pinnacle Irwin LLC, and Pinnacle
     Monterey LLC.  The Court will at times refer to them collectively as "AMS."

20   [3] *See Fort Benning Family Cmtys., LLC v. Am. Mgmt. Servs. E., LLC*, Superior Court of
     Muscogee County, Georgia, Civil Action No. SU10CV2025-F; *Monterey Bay v. Military*
21   *Housing, LLC*, United States District Court, Northern District of California, Case No.
     C14-3953-BLF.

22   [4] Policy provisions are identical between policies unless otherwise noted.

23

ORDER - 2

**B.     The Underlying Suits**

1.     *The Georgia Action*

Plaintiffs first requested coverage for the Georgia action by tendering to Lexington and Scottsdale the Complaint and First Amended Complaint in that action on July 31, 2010.  *See* Stip. Exs., docket no. 52, Ex. 50 (Scottsdale); Skinner Decl., docket no. 58, Ex. 1 (Lexington).  The Georgia action was brought by two entities, Fort Benning Family Communities, LLC ("FBFC") and Fort Belvoir Residential Communities, LLC ("FBRC"), which were created by the Army and AMS to privatize family housing and related facilities at the Fort Benning and Fort Belvoir military bases in Georgia.  Each entity entered into a Property Management Agreement ("PMA") with plaintiff AMSE to provide property management services to the housing facilities.

Plaintiffs in the Georgia action brought suit primarily seeking a declaratory judgment that the PMAs were terminated for cause.  The PMAs contained clauses which stated that each "agreement shall terminate for cause in the event of theft, fraud, or other knowing or intentional misconduct" by AMSE.  Stip. Exs., docket no. 51, Ex. 12 (First Amended Georgia Complaint ¶ 43).  In addition, the Georgia plaintiffs sought "to recover damages caused by fraud, including bribery and kickbacks taken from vendors in exchange for inflated rates and double billing."  *Id.* at ¶ 4.  The Georgia action centered on AMSE's alleged fraud, which included vendors providing expensive gifts in return for AMSE paying for phantom services, employees demanding bribes as a requirement to

1    hire specific vendors, and similar fraudulent conduct.  *Id.* ¶¶ 23-33.[5]  The Georgia

2    plaintiffs also alleged a scheme of covering up the fraudulent activity in order to avoid

3    detection.  *Id.* ¶¶ 39-41.  As a result, the Georgia action included the following claims: (i)

4    declaratory judgment that the PMAs were terminated for cause; (ii) breach of fiduciary

5    duty; (iii) aiding and abetting breach of fiduciary duty; (iv) fraud; (v) conspiracy to

6    commit fraud; (vi) unjust enrichment; and (vii) an accounting of wrongful profits.

7           After receiving the tender of the lawsuits, both insurers rejected coverage.  Stip.

8    Exs., docket no. 52, Ex. 23 (Lexington); Ex. 29 (Scottsdale).  Two years later plaintiffs

9    tendered the Fifth Amended Complaint in the Georgia action, specifically citing three

10    paragraphs.[6]  Stip. Exs., docket no. 52, Ex. 31 (Scottsdale); Ex. 54 (Lexington).  The first

11    cited paragraph alleged a scheme to sell scrap metal and improperly retain the proceeds.

12    Stip. Exs., docket no. 51, Ex. 16 (Fifth Amended Georgia Complaint ¶ 95).  The

13    remaining two paragraphs alleged that AMSE and its employees falsified work orders in

14    order to artificially inflate completion rates in order to secure performance-based

15    bonuses.  *Id.* ¶¶ 120, 125.  The Fifth Amended Complaint alleged that the maintenance

16    staff had no way to determine whether "maintenance problem[s] ha[ve] actually been

17    fixed or continue[] to pose a danger to residents."  *Id.* ¶ 125.  Both insurers subsequently

18    denied coverage.  Stip. Exs., docket no. 51, Ex. 24 (Lexington); Ex. 32 (Scottsdale).

19

---

20    [5] The complaint also alleged a "scheme to harvest and sell valuable scrap metal and potentially other materials of value" and to improperly retain the proceeds.  Stip. Exs.,

21    docket no. 51, Ex. 12 (First Amended Georgia Complaint ¶ 38).

22    [6] The Fifth Amended Complaint added causes of action for racketeering and violation of Georgia's state RICO statute.

23

ORDER - 4

2.     *The California Action*

Plaintiffs entered into a similar arrangement to manage privatized military housing for two military bases in California.  After being sued in California state court,[7] plaintiffs eventually tendered the Third Amended Complaint to the insurers.  Stip. Exs., docket no. 52, Ex. 54.  The Third Amended Complaint brought eleven counts, including declaratory relief canceling the management agreements, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraud, conspiracy to commit fraud, deceit, unfair business practices, and unjust enrichment.  Stip. Exs., docket no. 50, Ex. 20 (Third Amended California Complaint ¶ 1).  The California action was founded on essentially the same type of conduct alleged in the Georgia action, primarily centering on a scheme of rate overbillings, kickbacks from vendors, and falsification of work orders.  In their tender, plaintiffs specifically cited ¶ 91 of the complaint, which dealt with the increased "life and safety issues" which were created by their alleged fraud.  Both insurers subsequently denied coverage based upon the Third Amended Complaint.  Skinner Decl., docket no. 58, Ex. B (Lexington); Stip. Exs., docket no. 52, Ex. 32 (Scottsdale).[8]

---

[7] The defendants in that case subsequently removed it to the United States District Court for the Northern District of California.

[8] There is additionally a dispute as to whether plaintiffs properly tendered the Fifth Amended Complaint in the California action.  The only relevant distinction between the two is that the Fifth Amended Complaint added a federal RICO cause of action.  *See* Stip. Exs., docket no. 51, Ex. 11 (Fifth Amended California Complaint ¶¶ 250-267).  However, the Court concludes that even if the RICO claim had been properly tendered, it would not alter the conclusion reached herein.

3.      *Extrinsic Evidence*

Plaintiffs later submitted additional, extrinsic evidence to defendants arguing that the evidence demonstrated that the underlying suits fell within the policies' coverage.  In January 2015, plaintiffs submitted a collection of declarations and affidavits from their employees attesting to their knowledge of mismanagement of the military housing, including manipulation of work orders.  *See* Stip. Exs., docket no. 52, Exs. 37-48. Plaintiffs also offered the declaration of Paul David Cramer, Acting Deputy Assistant Secretary of the Army which was submitted in the California action.  Stip. Exs., docket no. 52, Ex. 49.  This brief declaration stresses the importance of properly responding to work orders in order to remediate "life safety issues."  *Id.* ¶ 7.  After reviewing this extrinsic evidence, both insurers reaffirmed their denial of coverage.  Stip. Exs., docket no. 52, Ex. 28 (Lexington); Ex. 36 (Scottsdale).  Plaintiffs and defendants both seek a declaratory judgment as to whether the duty to defend was implicated by the underlying lawsuits.

***Discussion***

**A.      *Summary Judgment Standard***

The Court shall grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if it might affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To survive a motion for summary judgment, the

ORDER - 6

adverse party must present affirmative evidence, which "is to be believed" and from which all "justifiable inferences" are to be favorably drawn. *Id.* at 255, 257. When the record, however, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, summary judgment is warranted. *See Beard v. Banks*, 548 U.S. 521, 529 (2006) ("Rule 56(c) 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).

**B.    *The Duty to Defend***

"[T]he duty to defend is different from and broader than the duty to indemnify." *Expedia, Inc. v. Steadfast Ins. Co.*, 180 Wn.2d 793, 802, 329 P.3d 59 (2014) (quoting *Am. Best Food, Inc. v. Alea London, Ltd.*, 168 Wn.2d 398, 404, 229 P.3d 693 (2010)).[9] "While the duty to indemnify exists only if the policy covers the insured's liability, the duty to defend is triggered if the insurance policy conceivably covers allegations in the complaint." *Id.* "The duty to defend arises when a complaint against the insured, construed liberally, alleges facts which could, if proven, impose liability upon the insured within the policy's coverage." *Id.* at 802-03 (quoting *Am. Best Food*, 168 Wn.2d at 404-05) (internal quotation marks omitted). The duty to defend demands that the insurer

---

[9] The parties have briefed this matter under the assumption that Washington law applies. Because no party has invoked foreign law, the Court will apply Washington law. *See Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1005 (9th Cir. 2001); *Prime Start Ltd. v. Maher Forest Prods, Ltd.*, 442 F. Supp.2d 1113, 1119 (W.D. Wash. 2006).

ORDER - 7

"give[s] the insured the benefit of the doubt when determining whether the insurance policy covers the allegations in the complaint." *Id.* at 803 (quoting *Woo v. Fireman's Fund Ins. Co.*, 161 Wn.2d 43, 60, 164 P.3d 454 (2007)).  If the complaint is ambiguous, the court will construe it "liberally in favor of triggering the duty to defend." *Id.*

Courts generally determine the duty to defend by reviewing the "eight corners" of the insurance contract and the underlying complaint. *Id.* at 803.  There are, however, two exceptions which can only be used to support a finding of coverage. *Id.*  "[I]f coverage is not clear from the face of the complaint but coverage could exist, the insurer must investigate and give the insured the benefit of the doubt on the duty to defend.  Second, if the allegations in the complaint conflict with facts known to the insurer or if the allegations are ambiguous, facts outside the complaint may be considered." *Id.* (citing *Woo*, 161 Wn.2d at 53) (internal citations omitted).

C.   *The Underlying Suits Do Not Allege Covered Damages*

The parties dispute whether the underlying actions seek damages because of covered harm.  The policies cover damages the insured becomes legally obligated to pay "because of 'bodily injury' or 'property damage.'"  Stip. Exs., docket no. 50, Ex. 6 (2008 Scottsdale Policy at 21).  "Bodily injury" is defined as "bodily injury, disability, sickness, or disease sustained by a person, including death resulting from any of these at any time." *Id.* at 33.  "Property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property" or alternatively "[l]oss of use of tangible property that is not physically injured." *Id.* at 35.  A reading of the complaints

tendered in both the Georgia and California actions does not give rise to the possibility of covered harm.

The underlying lawsuits sound in fraud, not in personal injury or property damage. These actions do not include claims for personal injury or property damage,[10] and there is not a single allegation of any such injury or damage.[11]  Lacking any such allegation, plaintiffs rely instead on the allegations regarding falsified work orders.  Paragraph 91 of the Third Amended California Complaint alleges that the "falsification of work orders has posed and continues to pose a direct risk to the life and safety of the military residents."  Stip. Exs., docket no. 51, Ex. 20.  The Georgia action makes similar allegations.  *See* Stip. Exs., docket no. 51, Ex. 16 (Fifth Amended Georgia Complaint ¶ 125).  Plaintiffs argue that the suits' allegation of "life safety issues" created by failure to properly address work orders is "shorthand" for bodily injury and property damage.  In contrast, defendants contend that such failure merely creates the possibility of a future

---

[10] Defendants suggest this fact is dispositive.  However, the policies contain broader language and cover all damages that the insured becomes obligated to pay "because of," not "for," property damage or bodily injury.  Accordingly, the Court rejects defendant Scottsdale's argument that there is no potential for damages "because of" bodily injury simply because the underlying plaintiffs were limited liability companies incapable of suffering that variety of harm.

[11] Plaintiffs contend that the allegations relating to the improper seizure of scrap metal in the California action raise the possibility of liability because of property damage.  Although Washington courts have not addressed the issue, other courts have rejected this argument.  *See, e.g.*, *Collin v. Am. Empire Ins. Co.*, 21 Cal. App. 4th 787, 817 (1994) ("Although no California court has specifically addressed whether 'conversion' is property damage, virtually every other court to consider the question has held that it is not.").  Moreover, intentional seizure of property would not qualify as a covered "occurrence."  *See infra*.

ORDER - 9

harm which has not yet occurred.  Logic dictates that without an actual harm suffered, there cannot be any damages awarded because of "bodily injury" or "property damage."

Plaintiffs cite a single, nearly thirty year-old district court case from Pennsylvania in arguing the creation of a risk of harm can constitute bodily injury or property damage. *See U.S. Fidelity & Guar. Co. v. Korman Corp.*, 693 F. Supp. 253 (E.D. Pa. 1988).  In *Korman*, the insured released hazardous waste into the soil, surface waters, and ground waters near the plaintiffs' homes.  *Id.* at 254.  Relying on dicta from a Pennsylvania superior court case, the *Korman* court noted that the plaintiffs "arguably allege 'property damage' or 'bodily injury'" before proceeding to deny coverage based on policy exclusions.  *Id.* at 259.  In addition, the plaintiffs in *Korman* actually alleged physical injury to the properties, rather than a mere risk.  *Id.* at 258.  *Korman* thus did not conclude that risk of harm constitutes property damage or bodily injury, and other cases reach the opposite conclusion.

In *Wellbrock v. Assurance Co. of America*, the Washington Court of Appeals concluded that insurance coverage was triggered not by the insured damaging the roots of a tree (i.e., creation of a risk of the tree falling), but only by the eventual falling of the tree upon a person.  90 Wn. App. 234, 242-43, 951 P.2d 367 (1998).  Although the court was primarily focused on determining when the "occurrence" took place, it still noted that the "mere presence of a 'hazard', defined as a 'source from which an accident may arise,' does not trigger coverage."  *Id.* at 243 (internal citation omitted).

The Court also finds guidance in cases addressing whether money spent to remediate risks is recoverable under insurance policies.  Courts routinely reject insurance

coverage for such costs.  For example, the Eighth Circuit concluded that money spent to repair a defective pipe system was not recoverable because the "repairs to the pipe's supporting system could easily be characterized as measures to prevent unknown future damage only, and thus would be outside the definition of 'property damage.'"  *Fireman's Fund Ins. Co. v. Hartford Fire Ins. Co.*, 73 F.3d 811, 815 (8th Cir. 1996); *see also Esicorp, Inc. v. Liberty Mut. Ins. Co.*, 266 F.3d 859, 862-63 (8th Cir. 2001) (cost to repair pipes in hydroelectric plant that had not yet burst or otherwise suffered harm not covered by insurance policy); *New Hampshire Ins. Co. v. Vieira*, 930 F.2d 696, 699-701 (9th Cir. 1991) (rejecting cost of repair as an insured harm).  In this line of cases, insurance coverage was not triggered until there was an event causing actual, physical damage, strongly suggesting that the risk of future harm is not in and of itself an insured harm.

Plaintiffs additionally argue that although the complaints do not allege actual bodily injury or property damage, the pleadings were sufficiently broad that there was "the possibility that the underlying plaintiffs *could* introduce evidence of actual property damage and/or bodily injury at the military properties in support of their claims for breach of fiduciary duty."  Pls.' Resp. to Defs.' Mots., docket no. 74, at 16 (emphasis added).  Plaintiffs anchor this argument in repeated recitations of the *Expedia* standard. *See* 180 Wn.2d at 802 ("[T]he duty to defend is triggered if the insurance policy conceivably covers allegations in the complaint.").  However, the lawsuits have not yet alleged any actual bodily injury or property damage.  The duty to defend only arises if the complaint "alleges facts which could, if proven, impose liability upon the insured within the policy's coverage."  *Expedia*, 180 Wn.2d at 802-03.  It is not enough to merely

ORDER - 11

1    speculate that the underlying plaintiffs *could* at a later time allege actual injury or

2    damage.  *See Grange Ins. Ass'n v. Roberts*, 179 Wn. App. 739, 753-56, 320 P.3d 77

3    (2013) (The "duty to defend [is] triggered if the … complaint, construed liberally, alleged

4    facts that could, if proven, impose liability upon [the insured] within the policy's

5    coverage.").  There are no allegations of actual bodily injury or property damage in either

6    underlying suit and accordingly no duty to defend is evidenced by the complaints.

7    **D.    *Extrinsic Evidence Submitted by Plaintiffs Does Not Establish Coverage***

8             Plaintiffs next argue that even if the complaints in the underlying actions do not on

9    their own establish coverage, extrinsic evidence does.  Although in Washington the rule

10   is that the "duty to defend is generally determined from the 'eight corners' of the

11   insurance contract and the underlying complaint," *Expedia*, 180 Wn.2d at 803, courts

12   may consider extrinsic evidence in two circumstances.  "First, if coverage is not clear

13   from the face of the complaint but coverage could exist, the insurer must investigate and

14   give the insured the benefit of the doubt on the duty to defend.  Second, if the allegations

15   in the complaint conflict with facts known to the insurer or if the allegations are

16   ambiguous, facts outside the complaint may be considered."  *Id.* at 803-04.  However, a

17   court may only consider extrinsic evidence to establish coverage, never to support a

18   determination against coverage.  *Id.* at 804.

19            The Court is not convinced that either exception is satisfied given how clearly the

20   underlying complaints sound in fraud.  However, even if the Court were to consider the

21   extrinsic evidence offered by plaintiffs, a finding of coverage would not be warranted.

22   Plaintiffs cite employee affidavits in the underlying suits, the Cramer Declaration, a

23

ORDER - 12

1   motion in limine from the California action, and two additional lawsuits brought by

2   tenants of the California military housing properties against AMS.

3          Neither the Cramer Declaration nor the employee affidavits from the underlying

4   suits, Stip. Exs., docket no. 52, Exs. 37-49, add anything beyond the complaints other

5   than expanding upon their allegations of intentional mismanagement and fraud.  None of

6   the employee affidavits references a specific injury, merely the possibility of future harm.

7   *See, e.g.*, Stip. Exs., docket no. 52, Ex. 37 (Guinard Affidavit at 4-5) ("I was especially

8   uncomfortable doing this [falsifying work order statistics] because I knew that meant the

9   work hadn't been done, which could pose a risk to the safety of our residents.").

10  Although the Cramer Declaration references a fire, it stresses that the fire was merely an

11  example of why responding to work orders correctly was important, rather than

12  suggesting it was the result of plaintiffs' misconduct.  Stip Exs., docket no. 52, Ex. 49

13  (Cramer Decl. ¶ 7).  Accordingly, the assorted affidavits and declarations merely

14  reinforce the allegations of the *risk* of future harm.

15         The motion in limine filed in the California action does not make it conceivable

16  that plaintiffs will become liable for damages because of property damage or personal

17  injury.  In that motion, AMS (there, defendants), sought to "bar argument that residents'

18  lives were put in danger."  Mathews Decl., docket no. 65, Ex. 8.  The motion in limine

19  suffers from the same flaw as the employee affidavits: there is no allegation of actual

20  property damage or bodily injury, merely that resident lives may have been put in danger.

21         Finally, plaintiffs cite to two lawsuits brought against them in California by

22  residents of the housing facilities.  In those actions, known as the *Mosquera* and

23

ORDER - 13

1    *Charbonneau* suits, resident plaintiffs alleged bodily injury as a result of AMS's conduct.

2    *See generally* Mathews Decl., docket no. 66, Exs. 11; 14.  Plaintiffs argue these suits

3    make it conceivable they could be forced to pay damages for bodily injury or property

4    damage in the Georgia and California actions.  The implicit argument appears to be that

5    because one set of plaintiffs have alleged actual bodily injury, it is possible for another to

6    do so, irrespective of the operative pleadings.  However, that separate groups of plaintiffs

7    allegedly wronged by AMS's conduct have elected to proceed differently is not a basis to

8    find coverage.[12]

9    **E.     *Plaintiffs' Alleged Intentional Misconduct Is Not an "Occurrence"***

10           Even if the underlying complaints raised the possibility of liability for "property

11   damage" or "bodily injury," there would still be no duty to defend.  The policies only

12   cover damages resulting from an "occurrence," which is defined as "an accident,

13   including continuous or repeated exposure to substantially the same general harmful

14   conditions."  Stip. Exs., docket no. 50, Ex. 6 (2008 Scottsdale Policy at 34) (internal

15   quotations omitted).  The term "accident" is not defined in the policies.  The core dispute

16   _____

17   [12] Plaintiffs additionally suggest that although the underlying suits do not seek recovery
     "for" property damage or bodily injury (e.g., a negligence action), any damages
18   recovered would still be the consequential damages of property damage or bodily injury.
     Washington law is clear that consequential losses are only recoverable when they are the
19   result of an independently covered harm.  *Yakima Cement Prods. Co. v. Great Am. Ins.
     Co.*, 93 Wn.2d 210, 219, 608 P.2d 254 (1980) ("[C]onsequential damages arising from
20   intangible injury may be awarded only when they result from injury to or destruction of
     tangible property."); *General Ins. Co. of Am. v. Gauger*, 13 Wn. App. 928, 931, 538 P.2d
21   563 (1975) ("[O]nce the injury is covered by the policy, *then* the resulting damage is
     covered.") (emphasis added).  Lacking any allegation of property damage or bodily
22   injury, this argument fails.

23

with respect to the "occurrence" clause is whether plaintiffs' employees' intentional conduct can be an "accident."  Plaintiffs argue that whether a result is an "accident" must be evaluated from the subjective perspective of the individual who caused it.  In contrast, defendants argue that Washington law holds that an intentional act can never be an accident, and furthermore, whether a result is an accident is an objective inquiry.  The Court concludes that the specific language used in these policies requires an objective analysis.

Where the word "accident" is not defined in a policy, courts look to common law for a definition.  *Detweiler v. J.C. Penney Cas. Ins. Co.*, 110 Wn.2d 99, 104, 751 P.2d 282 (1988).  The Washington Supreme Court "has referenced two similar definitions of the term 'accident' in insurance coverage cases: (1) an unusual, unexpected, and unforeseen happening; and (2) a loss that happens without design, intent, or obvious motivation."  *United Servs. Auto. Ass'n v. Speed*, 179 Wn. App. 184, 197-98, 317 P.3d 532 (2014) (internal citations and quotations omitted), *review denied* 180 Wn.2d 1015, 327 P.3d 55 (2014).  In light of the common-law definition, Washington courts have routinely found that "an accident is never present when a deliberate act is performed." *Unigard Mut. Ins. Co. v. Spokane Sch. Dist. 81*, 20 Wn. App. 261, 263-64, 579 P.2d 1015 (1978).  However, a deliberate act may be an accident if "some additional unexpected, independent, and unforeseen happening occurs which produces or brings about the result of injury or death."  *Detweiler*, 110 Wn.2d at 104.

"Whether an event constitutes an accident is determined objectively and does not depend on the insured's subjective perspective.  Either an incident is an accident or it is

not." *United Servs. Auto. Ass'n*, 179 Wn. App. at 198 (quoting *Roller v. Stonewall Ins. Co.*, 115 Wn.2d 679, 685, 801 P.2d 207 (1990)) (internal citations and quotations omitted).  In *Grange Insurance Association*, the court faced an identical definition of "occurrence" where the insured acted intentionally but argued that the resulting harm was unintended from his perspective.  179 Wn. App. at 755.  The court rejected that argument, concluding that "[w]here an insured acts intentionally but claims that the result was unintended, the incident is not an accident if the insured knew or should have known facts from which a prudent person would have concluded that the harm was reasonably foreseeable."  *Id.* (citing *State Farm Fire & Cas. Co. v. Parrella*, 134 Wn. App. 536, 540, 141 P.3d 643 (2006)).

Plaintiffs primarily rely on two cases to argue that the results must be subjectively expected from the perspective of the actor in order to not qualify as an accident.  In the first, the Washington Supreme Court considered a different definition of occurrence: "an accident or happening or event or a continuous or repeated exposure to conditions which *unexpectedly and unintentionally* results in personal injury, property damage…" *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 126 Wn.2d 50, 64, 882 P.2d 703 (1994) (emphasis added).  The court ultimately determined that because the policy was silent on from whose perspective the result had to be unexpected and unintentional, that it was ambiguous and that "[u]nresolved ambiguities are resolved against the drafter-insurer and in favor of the insured."  *Id.* at 713 (citing *Greer v. Nw. Nat'l Ins. Co.*, 109 Wn.2d 191, 201, 743 P.2d 1244 (1987)).  In contrast, the policies in this case do not contain a

1    requirement that the accident "unexpectedly and unintentionally" result in harm.

2    Plaintiffs' reliance on *Queen City* is thus misplaced.

3        In *Nationwide Mutual Insurance Co. v. Hayles, Inc.*, the court was presented with

4    the same definition of "occurrence" as in this case where one of the insured's employees

5    turned on an irrigation system which caused an onion crop to rot.  136 Wn. App. 531, 150

6    P.3d 589 (2007).  The insurer argued that because the employee intentionally turned on

7    the irrigation system, that it could not be an "accident," relying on *Roller*.  *Id.* at 537-38.

8    However, the court rejected the argument that "an accident must be caused by an

9    unconscious, nonvolitional act," determining that "[i]ntentional, wrongful acts will not

10   qualify as accidents or 'occurrences' if the results could not have been expected from the

11   acts."  *Id.*  Although the employee intended to turn on the irrigation system, its

12   destruction could not reasonably have been expected from doing so.  Thus, the key

13   holding of *Hayles* is not that accidents must result from "unconscious, nonvolitional"

14   conduct, but that the results must not be objectively foreseeable.[13]

15       It is clear that damaged property and bodily injury are the natural, foreseeable

16   results of not properly addressing repair requests at a housing facility.  The underlying

17   plaintiffs have only alleged intentional misconduct by AMS.[14]  The Court therefore

18

19   _____

20   [13] The *Hayles* court's ultimate conclusion that "the record provides no evidence that
     [employee] knew *or should have known* that turning on the irrigation system would
     damage the onion crop" further demonstrate that it employed an objective analysis.  136
21   Wn. App. at 539 (emphasis added).

22   [14] Plaintiffs also suggest that the breach of fiduciary duty claims could be sustained by
     unintentional conduct.  However, the complaints in both the Georgia and California

23

ORDER - 17

1    concludes that the bodily injury or property damage, if any, was not the result of an

2    "occurrence" as defined by the policies and thus there was no duty to defend in the

3    underlying actions.[15]

4

5

6

7

8

9

_____

10   actions make clear that the underlying plaintiffs are alleging only intentional misconduct.
     *See Grange Ins. Ass'n*, 179 Wn. App. at 754-56 (analyzing duty to defend based solely
11   on the factual allegations of intentional conduct, even where unintentional conduct could
12   satisfy the cause of action).

     [15] The Court also determines that the policy exclusions would not have precluded the
13   duty to defend had it existed.  Defendants bear the burden of showing that an exclusion
     applies to totally bar coverage.  *See Mut. of Enumclaw Ins. Co. v. T&G Const., Inc.*, 165
14   Wn.2d 255, 268, 199 P.3d 376 (2008) ("[E]xclusionary clauses in the insurance contract
     are to be most strictly construed against the insurer.").  Both insurers invoke the mold and
15   pollution exclusions, the expected or intended injury exclusion, and the owned or
     occupied property exclusion.  To the extent any damage or bodily harm is present, it is
16   not wholly encompassed by mold and pollution.  The expected injury exclusion is
     inapplicable because the policy language requires that the damage be "expected or
17   intended from the standpoint of the insured," in contrast to the definition of "occurrence."
     Stip. Exs., docket no. 50, Ex. 6 (2008 Scottsdale Policy at 22).  This language inherently
18   involves a subjective analysis, for which there is insufficient evidence in the record.  *See*
     126 Wn.2d at 69.  The owned or occupied property exclusion is applicable *only* to
19   property damage and would not bar coverage for bodily injury.  Lexington additionally
     argues that the cross-suit exclusion applies because the underlying plaintiffs are
20   considered insureds for the purpose of these policies.  However, not all of Lexington's
     policies contained that exclusion and accordingly the exclusions would not wholly
21   extinguish any potential liability.  In sum, although defendants' policy exclusions may
     have ultimately limited some quantum of coverage after a full litigation of the underlying
22   suits, the Court concludes that they could not serve to remove the duty to defend.

23

ORDER - 18

*Conclusion*

For the above reasons, defendants' motions, docket nos. 53 and 57, are GRANTED.  Plaintiffs' motion, docket no. 59, is DENIED.  The Court determines as a matter of law that defendants had no duty to defend plaintiffs in the underlying suits.

IT IS SO ORDERED.

Dated this 15th day of April, 2016.

Thomas S. Zilly
United States District Judge

ORDER - 19